(Slip Opinion) OCTOBER TERM, 2010 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SORRELL, ATTORNEY GENERAL OF VERMONT, ET AL. *v*. IMS HEALTH INC. ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 10–779.   Argued April 26, 2011—Decided June 23, 2011

Pharmaceutical manufacturers promote their drugs to doctors through a process called "detailing."   Pharmacies receive "prescriber-identifying information" when processing prescriptions and sell the information to "data miners," who produce reports on prescriber behavior and lease their reports to pharmaceutical manufacturers. "Detailers" employed by pharmaceutical manufacturers then use the reports to refine their marketing tactics and increase sales to doctors. Vermont's Prescription Confidentiality Law provides that, absent the prescriber's consent, prescriber-identifying information may not be sold by pharmacies and similar entities, disclosed by those entities for marketing purposes, or used for marketing by pharmaceutical manufacturers.   Vt. Stat. Ann., Tit. 18, §4631(d).   The prohibitions are subject to exceptions that permit the prescriber-identifying information to be disseminated and used for a number of purposes, *e.g.,* "health care research."  §4631(e).

Respondents, Vermont data miners and an association of brand-name drug manufacturers, sought declaratory and injunctive relief against state officials (hereinafter Vermont), contending that §4631(d) violates their rights under the Free Speech Clause of the First Amendment.   The District Court denied relief, but the Second Circuit reversed, holding that §4631(d) unconstitutionally burdens the speech of pharmaceutical marketers and data miners without adequate justification.

*Held*:

1. Vermont's statute, which imposes content- and speaker-based burdens on protected expression, is subject to heightened judicial scrutiny.  Pp. 6–15.

Syllabus

    (a) On its face, the law enacts a content- and speaker-based restriction on the sale, disclosure, and use of prescriber-identifying information. The law first forbids sale subject to exceptions based in large part on the content of a purchaser's speech. It then bars pharmacies from disclosing the information when recipient speakers will use that information for marketing. Finally, it prohibits pharmaceutical manufacturers from using the information for marketing. The statute thus disfavors marketing, *i.e.,* speech with a particular content, as well as particular speakers*, i.e.*, detailers engaged in marketing on behalf of pharmaceutical manufacturers. *Cincinnati* v. *Discovery Network, Inc.*, 507 U. S. 410, 426; *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 658. Yet the law allows prescriber-identifying information to be purchased, acquired, and used for other types of speech and by other speakers. The record and formal legislative findings of purpose confirm that §4631(d) imposes an aimed, content-based burden on detailers, in particular detailers who promote brand-name drugs. In practical operation, Vermont's law "goes even beyond mere content discrimination, to actual viewpoint discrimination." *R. A. V.* v. *St. Paul*, 505 U. S. 377, 391. Heightened judicial scrutiny is warranted. Pp. 8–11.

    (b) Vermont errs in arguing that heightened scrutiny is unwarranted. The State contends that its law is a mere commercial regulation. Far from having only an incidental effect on speech, however, §4631(d) imposes a burden based on the content of speech and the identity of the speaker. The State next argues that, because prescriber-identifying information was generated in compliance with a legal mandate, §4631(d) is akin to a restriction on access to government-held information. That argument finds some support in *Los Angeles Police Dept.* v. *United Reporting Publishing Corp.*, 528 U. S. 32, but that case is distinguishable. Vermont has imposed a restriction on access to information in private hands. *United Reporting* reserved that situation—*i.e.,* "a case in which the government is prohibiting a speaker from conveying information that the speaker already possesses." *Id.,* at 40. In addition, the *United Reporting* plaintiff was presumed to have suffered no personal First Amendment injury, while respondents claim that §4631(d) burdens their own speech. That circumstance warrants heightened scrutiny. Vermont also argues that heightened judicial scrutiny is unwarranted because sales, transfer, and use of prescriber-identifying information are conduct, not speech. However, the creation and dissemination of information are speech for First Amendment purposes. See, *e.g.*, *Bartnicki* v. *Vopper*, 532 U. S. 514, 527. There is no need to consider Vermont's request for an exception to that rule. Section 4631(d) imposes a speaker- and content-based burden on protected expression, and that

circumstance is sufficient to justify applying heightened scrutiny, even assuming that prescriber-identifying information is a mere commodity. Pp. 11–15.

2. Vermont's justifications for §4631(d) do not withstand heightened scrutiny. Pp. 15–24.

(a) The outcome here is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied, see, *e.g.*, *Greater New Orleans Broadcasting Assn., Inc.* v. *United States*, 527 U. S. 173, 184. To sustain §4631(d)'s targeted, content-based burden on protected expression, Vermont must show at least that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest. See *Board of Trustees of State Univ. of N. Y. v. Fox,* 492 U. S. 469, 480–481. Vermont contends that its law (1) is necessary to protect medical privacy, including physician confidentiality, avoidance of harassment, and the integrity of the doctor-patient relationship, and (2) is integral to the achievement of the policy objectives of improving public health and reducing healthcare costs. Pp. 15–17.

(b) Assuming that physicians have an interest in keeping their prescription decisions confidential, §4631(d) is not drawn to serve that interest. Pharmacies may share prescriber-identifying information with anyone for any reason except for marketing. Vermont might have addressed physician confidentiality through "a more coherent policy," *Greater New Orleans Broadcasting*, *supra*, at 195, such as allowing the information's sale or disclosure in only a few narrow and well-justified circumstances. But it did not. Given the information's widespread availability and many permissible uses, Vermont's asserted interest in physician confidentiality cannot justify the burdens that §4631(d) imposes on protected expression. It is true that doctors can forgo the law's advantages by consenting to the sale, disclosure, and use of their prescriber-identifying information. But the State has offered only a contrived choice: Either consent, which will allow the doctor's prescriber-identifying information to be disseminated and used without constraint; or, withhold consent, which will allow the information to be used by those speakers whose message the State supports. Cf. *Rowan* v. *Post Office Dept.*, 397 U. S. 728. Respondents suggest a further defect lies in §4631(d)'s presumption of applicability absent an individual election to the contrary. Reliance on a prior election, however, would not save a privacy measure that imposed an unjustified burden on protected expression. Vermont also asserts that its broad content-based rule is necessary to avoid harassment, but doctors can simply decline to meet with detailers. Cf. *Watchtower Bible & Tract Soc. of N. Y., Inc.* v. *Village of Stratton*, 536 U. S. 150, 168. Vermont further argues that detailers'

use of prescriber-identifying information undermines the doctor-patient relationship by allowing detailers to influence treatment decisions. But if pharmaceutical marketing affects treatment decisions, it can do so only because it is persuasive. Fear that speech might persuade provides no lawful basis for quieting it. Pp. 17–21.

(c) While Vermont's goals of lowering the costs of medical services and promoting public health may be proper, §4631(d) does not advance them in a permissible way. Vermont seeks to achieve those objectives through the indirect means of restraining certain speech by certain speakers—*i.e.,* by diminishing detailers' ability to influence prescription decisions. But "the fear that people would make bad decisions if given truthful information" cannot justify content-based burdens on speech. *Thompson* v. *Western States Medical Center*, 535 U. S. 357, 374. That precept applies with full force when the audience—here, prescribing physicians—consists of "sophisticated and experienced" consumers. *Edenfield* v. *Fane*, 507 U. S. 761, 775. The instant law's defect is made clear by the fact that many listeners find detailing instructive. Vermont may be displeased that detailers with prescriber-indentifying information are effective in promoting brand-name drugs, but the State may not burden protected expression in order to tilt public debate in a preferred direction. Vermont nowhere contends that its law will prevent false or misleading speech within the meaning of this Court's First Amendment precedents. The State's interest in burdening detailers' speech thus turns on nothing more than a difference of opinion. Pp. 21–24.

630 F. 3d 263, affirmed.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, THOMAS, ALITO, and SOTOMAYOR, JJ., joined. BREYER, J., filed a dissenting opinion, in which GINSBURG and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 10–779

WILLIAM H. SORRELL, ATTORNEY GENERAL OF VERMONT, ET AL., PETITIONERS *v.* IMS HEALTH INC. ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 23, 2011]

JUSTICE KENNEDY delivered the opinion of the Court.

Vermont law restricts the sale, disclosure, and use of pharmacy records that reveal the prescribing practices of individual doctors.  Vt. Stat. Ann., Tit. 18, §4631 (Supp. 2010).  Subject to certain exceptions, the information may not be sold, disclosed by pharmacies for marketing purposes, or used for marketing by pharmaceutical manufacturers.  Vermont argues that its prohibitions safeguard medical privacy and diminish the likelihood that marketing will lead to prescription decisions not in the best interests of patients or the State.  It can be assumed that these interests are significant.  Speech in aid of pharmaceutical marketing, however, is a form of expression protected by the Free Speech Clause of the First Amendment.  As a consequence, Vermont's statute must be subjected to heightened judicial scrutiny.  The law cannot satisfy that standard.

I
A

Pharmaceutical manufacturers promote their drugs to

doctors through a process called "detailing." This often involves a scheduled visit to a doctor's office to persuade the doctor to prescribe a particular pharmaceutical. Detailers bring drug samples as well as medical studies that explain the "details" and potential advantages of various prescription drugs. Interested physicians listen, ask questions, and receive followup data. Salespersons can be more effective when they know the background and purchasing preferences of their clientele, and pharmaceutical salespersons are no exception. Knowledge of a physician's prescription practices—called "prescriber-identifying information"—enables a detailer better to ascertain which doctors are likely to be interested in a particular drug and how best to present a particular sales message. Detailing is an expensive undertaking, so pharmaceutical companies most often use it to promote high-profit brand-name drugs protected by patent. Once a brand-name drug's patent expires, less expensive bioequivalent generic alternatives are manufactured and sold.

Pharmacies, as a matter of business routine and federal law, receive prescriber-identifying information when processing prescriptions. See 21 U. S. C. §353(b); see also Vt. Bd. of Pharmacy Admin. Rule 9.1 (2009); Rule 9.2. Many pharmacies sell this information to "data miners," firms that analyze prescriber-identifying information and produce reports on prescriber behavior. Data miners lease these reports to pharmaceutical manufacturers subject to nondisclosure agreements. Detailers, who represent the manufacturers, then use the reports to refine their marketing tactics and increase sales.

In 2007, Vermont enacted the Prescription Confidentiality Law. The measure is also referred to as Act 80. It has several components. The central provision of the present case is §4631(d).

"A health insurer, a self-insured employer, an elec-

tronic transmission intermediary, a pharmacy, or other similar entity shall not sell, license, or exchange for value regulated records containing prescriber-identifiable information, nor permit the use of regulated records containing prescriber-identifiable information for marketing or promoting a prescription drug, unless the prescriber consents . . . . Pharmaceutical manufacturers and pharmaceutical marketers shall not use prescriber-identifiable information for marketing or promoting a prescription drug unless the prescriber consents . . . ."

The quoted provision has three component parts. The provision begins by prohibiting pharmacies, health insurers, and similar entities from selling prescriber-identifying information, absent the prescriber's consent. The parties here dispute whether this clause applies to all sales or only to sales for marketing. The provision then goes on to prohibit pharmacies, health insurers, and similar entities from allowing prescriber-identifying information to be used for marketing, unless the prescriber consents. This prohibition in effect bars pharmacies from disclosing the information for marketing purposes. Finally, the provision's second sentence bars pharmaceutical manufacturers and pharmaceutical marketers from using prescriber-identifying information for marketing, again absent the prescriber's consent. The Vermont attorney general may pursue civil remedies against violators. §4631(f).

Separate statutory provisions elaborate the scope of the prohibitions set out in §4631(d). "Marketing" is defined to include "advertising, promotion, or any activity" that is "used to influence sales or the market share of a prescription drug." §4631(b)(5). Section 4631(c)(1) further provides that Vermont's Department of Health must allow "a prescriber to give consent for his or her identifying information to be used for the purposes" identified in §4631(d).

Finally, the Act's prohibitions on sale, disclosure, and use are subject to a list of exceptions. For example, prescriber-identifying information may be disseminated or used for "health care research"; to enforce "compliance" with health insurance formularies, or preferred drug lists; for "care management educational communications provided to" patients on such matters as "treatment options"; for law enforcement operations; and for purposes "otherwise provided by law." §4631(e).

Act 80 also authorized funds for an "evidence-based prescription drug education program" designed to provide doctors and others with "information and education on the therapeutic and cost-effective utilization of prescription drugs." §4622(a)(1). An express aim of the program is to advise prescribers "about commonly used brand-name drugs for which the patent has expired" or will soon expire. §4622(a)(2). Similar efforts to promote the use of generic pharmaceuticals are sometimes referred to as "counter-detailing." App. 211; see also *IMS Health Inc.* v. *Ayotte*, 550 F. 3d 42, 91 (CA1 2008) (Lipez, J., concurring and dissenting). The counterdetailer's recommended substitute may be an older, less expensive drug and not a bioequivalent of the brand-name drug the physician might otherwise prescribe. Like the pharmaceutical manufacturers whose efforts they hope to resist, counterdetailers in some States use prescriber-identifying information to increase their effectiveness. States themselves may supply the prescriber-identifying information used in these programs. See App. 313; *id.*, at 375 ("[W]e use the data given to us by the State of Pennsylvania . . . to figure out which physicians to talk to"); see also *id.*, at 427–429 (Director of the Office of Vermont Health Access explaining that the office collects prescriber-identifying information but "does not at this point in time have a counter-detailing or detailing effort"). As first enacted, Act 80 also required detailers to provide information about alternative

treatment options. The Vermont Legislature, however, later repealed that provision. 2008 Vt. Laws No. 89, §3.

Act 80 was accompanied by legislative findings. Vt. Acts No. 80, §1. Vermont found, for example, that the "goals of marketing programs are often in conflict with the goals of the state" and that the "marketplace for ideas on medicine safety and effectiveness is frequently one-sided in that brand-name companies invest in expensive pharmaceutical marketing campaigns to doctors." §§1(3), (4). Detailing, in the legislature's view, caused doctors to make decisions based on "incomplete and biased information." §1(4). Because they "are unable to take the time to research the quickly changing pharmaceutical market," Vermont doctors "rely on information provided by pharmaceutical representatives." §1(13). The legislature further found that detailing increases the cost of health care and health insurance, §1(15); encourages hasty and excessive reliance on brand-name drugs, before the profession has observed their effectiveness as compared with older and less expensive generic alternatives, §1(7); and fosters disruptive and repeated marketing visits tantamount to harassment, §§1(27)–(28). The legislative findings further noted that use of prescriber-identifying information "increase[s] the effect of detailing programs" by allowing detailers to target their visits to particular doctors. §§1(23)–(26). Use of prescriber-identifying data also helps detailers shape their messages by "tailoring" their "presentations to individual prescriber styles, preferences, and attitudes." §1(25).

## B

The present case involves two consolidated suits. One was brought by three Vermont data miners, the other by an association of pharmaceutical manufacturers that produce brand-name drugs. These entities are the respondents here. Contending that §4631(d) violates their

First Amendment rights as incorporated by the Fourteenth Amendment, the respondents sought declaratory and injunctive relief against the petitioners, the Attorney General and other officials of the State of Vermont.

After a bench trial, the United States District Court for the District of Vermont denied relief. 631 F. Supp. 2d 434 (2009). The District Court found that "[p]harmaceutical manufacturers are essentially the only paying customers of the data vendor industry" and that, because detailing unpatented generic drugs is not "cost-effective," pharmaceutical sales representatives "detail only branded drugs." *Id.*, at 451, 442. As the District Court further concluded, "the Legislature's determination that [prescriber-identifying] data is an effective marketing tool that enables detailers to increase sales of new drugs is supported in the record." *Id.*, at 451. The United States Court of Appeals for the Second Circuit reversed and remanded. It held that §4631(d) violates the First Amendment by burdening the speech of pharmaceutical marketers and data miners without an adequate justification. 630 F. 3d 263. Judge Livingston dissented.

The decision of the Second Circuit is in conflict with decisions of the United States Court of Appeals for the First Circuit concerning similar legislation enacted by Maine and New Hampshire. See *IMS Health Inc.* v. *Mills*, 616 F. 3d 7 (CA1 2010) (Maine); *Ayotte*, *supra* (New Hampshire). Recognizing a division of authority regarding the constitutionality of state statutes, this Court granted certiorari. 562 U. S. __ (2011).

II

The beginning point is the text of §4631(d). In the proceedings below, Vermont stated that the first sentence of §4631(d) prohibits pharmacies and other regulated entities from selling or disseminating prescriber-identifying information for marketing. The information,

in other words, could be sold or given away for purposes
other than marketing. The District Court and the Court of
Appeals accepted the State's reading. See 630 F. 3d,
at 276. At oral argument in this Court, however, the
State for the first time advanced an alternative reading of
§4631(d)—namely, that pharmacies, health insurers, and
similar entities may not sell prescriber-identifying infor-
mation for any purpose, subject to the statutory exceptions
set out at §4631(e). See Tr. of Oral Arg. 19–20. It might
be argued that the State's newfound interpretation comes
too late in the day. See *Sprietsma* v. *Mercury Marine*, 537
U. S. 51, 56, n. 4 (2002) (waiver); *New Hampshire* v.
*Maine*, 532 U. S. 742, 749 (2001) (judicial estoppel). The
respondents, the District Court, and the Court of Appeals
were entitled to rely on the State's plausible interpretation
of the law it is charged with enforcing. For the State to
change its position is particularly troubling in a First
Amendment case, where plaintiffs have a special interest
in obtaining a prompt adjudication of their rights, despite
potential ambiguities of state law. See *Houston* v. *Hill*,
482 U. S. 451, 467–468, and n. 17 (1987); *Zwickler* v.
*Koota*, 389 U. S. 241, 252 (1967).

In any event, §4631(d) cannot be sustained even under
the interpretation the State now adopts. As a consequence
this Court can assume that the opening clause of §4631(d)
prohibits pharmacies, health insurers, and similar entities
from selling prescriber-identifying information, subject to
the statutory exceptions set out at §4631(e). Under that
reading, pharmacies may sell the information to private or
academic researchers, see §4631(e)(1), but not, for exam-
ple, to pharmaceutical marketers. There is no dispute as
to the remainder of §4631(d). It prohibits pharmacies,
health insurers, and similar entities from disclosing or
otherwise allowing prescriber-identifying information to
be used for marketing. And it bars pharmaceutical manu-
facturers and detailers from using the information for

marketing. The questions now are whether §4631(d) must be tested by heightened judicial scrutiny and, if so, whether the State can justify the law.

## A

### 1

On its face, Vermont's law enacts content- and speaker-based restrictions on the sale, disclosure, and use of prescriber-identifying information. The provision first forbids sale subject to exceptions based in large part on the content of a purchaser's speech. For example, those who wish to engage in certain "educational communications," §4631(e)(4), may purchase the information. The measure then bars any disclosure when recipient speakers will use the information for marketing. Finally, the provision's second sentence prohibits pharmaceutical manufacturers from using the information for marketing. The statute thus disfavors marketing, that is, speech with a particular content. More than that, the statute disfavors specific speakers, namely pharmaceutical manufacturers. As a result of these content- and speaker-based rules, detailers cannot obtain prescriber-identifying information, even though the information may be purchased or acquired by other speakers with diverse purposes and viewpoints. Detailers are likewise barred from using the information for marketing, even though the information may be used by a wide range of other speakers. For example, it appears that Vermont could supply academic organizations with prescriber-identifying information to use in countering the messages of brand-name pharmaceutical manufacturers and in promoting the prescription of generic drugs. But §4631(d) leaves detailers no means of purchasing, acquiring, or using prescriber-identifying information. The law on its face burdens disfavored speech by disfavored speakers.

Any doubt that §4631(d) imposes an aimed, content-

based burden on detailers is dispelled by the record and by formal legislative findings. As the District Court noted, "[p]harmaceutical manufacturers are essentially the only paying customers of the data vendor industry"; and the almost invariable rule is that detailing by pharmaceutical manufacturers is in support of brand-name drugs. 631 F. Supp. 2d, at 451. Vermont's law thus has the effect of preventing detailers—and only detailers—from communicating with physicians in an effective and informative manner. Cf. *Edenfield* v. *Fane*, 507 U. S. 761, 766 (1993) (explaining the "considerable value" of in-person solicitation). Formal legislative findings accompanying §4631(d) confirm that the law's express purpose and practical effect are to diminish the effectiveness of marketing by manufacturers of brand-name drugs. Just as the "inevitable effect of a statute on its face may render it unconstitutional," a statute's stated purposes may also be considered. *United States* v. *O'Brien*, 391 U. S. 367, 384 (1968). Here, the Vermont Legislature explained that detailers, in particular those who promote brand-name drugs, convey messages that "are often in conflict with the goals of the state." 2007 Vt. No. 80, §1(3). The legislature designed §4631(d) to target those speakers and their messages for disfavored treatment. "In its practical operation," Vermont's law "goes even beyond mere content discrimination, to actual viewpoint discrimination." *R. A. V.* v. *St. Paul*, 505 U. S. 377, 391 (1992). Given the legislature's expressed statement of purpose, it is apparent that §4631(d) imposes burdens that are based on the content of speech and that are aimed at a particular viewpoint.

Act 80 is designed to impose a specific, content-based burden on protected expression. It follows that heightened judicial scrutiny is warranted. See *Cincinnati* v. *Discovery Network, Inc.*, 507 U. S. 410, 418 (1993) (applying heightened scrutiny to "a categorical prohibition on the use of newsracks to disseminate commercial messages"); *id.*, at

429 ("[T]he very basis for the regulation is the difference in content between ordinary newspapers and commercial speech" in the form of "commercial handbills . . . .  Thus, by any commonsense understanding of the term, the ban in this case is 'content based' " (some internal quotation marks omitted)); see also *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 658 (1994) (explaining that strict scrutiny applies to regulations reflecting "aversion" to what "disfavored speakers" have to say).  The Court has recognized that the "distinction between laws burdening and laws banning speech is but a matter of degree" and that the "Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 812 (2000).  Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content.  See *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 115 (1991) (content-based financial burden); *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575 (1983) (speaker-based financial burden).

The First Amendment requires heightened scrutiny whenever the government creates "a regulation of speech because of disagreement with the message it conveys." *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791 (1989); see also *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41, 48 (1986) (explaining that "'content-neutral' speech regulations" are "those that are *justified* without reference to the content of the regulated speech" (internal quotation marks omitted)).  A government bent on frustrating an impending demonstration might pass a law demanding two years' notice before the issuance of parade permits.  Even if the hypothetical measure on its face appeared neutral as to content and speaker, its purpose to suppress speech and its unjustified burdens on expression would render it unconstitutional.  *Ibid.*  Commercial speech is no excep-

tion. See *Discovery Network*, *supra*, at 429–430 (commercial speech restriction lacking a "neutral justification" was not content neutral). A "consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue." *Bates* v. *State Bar of Ariz.*, 433 U. S. 350, 364 (1977). That reality has great relevance in the fields of medicine and public health, where information can save lives.

2

The State argues that heightened judicial scrutiny is unwarranted because its law is a mere commercial regulation. It is true that restrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct. It is also true that the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech. That is why a ban on race-based hiring may require employers to remove " 'White Applicants Only' " signs, *Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.*, 547 U. S. 47, 62 (2006); why "an ordinance against outdoor fires" might forbid "burning a flag," *R. A. V.*, *supra*, at 385; and why antitrust laws can prohibit "agreements in restraint of trade," *Giboney* v. *Empire Storage & Ice Co.*, 336 U. S. 490, 502 (1949).

But §4631(d) imposes more than an incidental burden on protected expression. Both on its face and in its practical operation, Vermont's law imposes a burden based on the content of speech and the identity of the speaker. See *supra*, at 8–11. While the burdened speech results from an economic motive, so too does a great deal of vital expression. See *Bigelow* v. *Virginia*, 421 U. S. 809, 818 (1975); *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 266 (1964); see also *United States* v. *United Foods, Inc.*, 533 U. S. 405, 410–411 (2001) (applying "First Amendment scrutiny" where speech effects were not incidental and

noting that "those whose business and livelihood depend in some way upon the product involved no doubt deem First Amendment protection to be just as important for them as it is for other discrete, little noticed groups"). Vermont's law does not simply have an effect on speech, but is directed at certain content and is aimed at particular speakers. The Constitution "does not enact Mr. Herbert Spencer's Social Statics." *Lochner* v. *New York*, 198 U. S. 45, 75 (1905) (Holmes, J., dissenting). It does enact the First Amendment.

Vermont further argues that §4631(d) regulates not speech but simply access to information. Prescriber-identifying information was generated in compliance with a legal mandate, the State argues, and so could be considered a kind of governmental information. This argument finds some support in *Los Angeles Police Dept.* v. *United Reporting Publishing Corp.*, 528 U. S. 32 (1999), where the Court held that a plaintiff could not raise a facial challenge to a content-based restriction on access to government-held information. Because no private party faced a threat of legal punishment, the Court characterized the law at issue as "nothing more than a governmental denial of access to information in its possession." *Id.*, at 40. Under those circumstances the special reasons for permitting First Amendment plaintiffs to invoke the rights of others did not apply. *Id.*, at 38–39. Having found that the plaintiff could not raise a facial challenge, the Court remanded for consideration of an as-applied challenge. *Id.*, at 41. *United Reporting* is thus a case about the availability of facial challenges. The Court did not rule on the merits of any First Amendment claim.

*United Reporting* is distinguishable in at least two respects. First, Vermont has imposed a restriction on access to information in private hands. This confronts the Court with a point reserved, and a situation not addressed, in *United Reporting*. Here, unlike in *United*

*Reporting*, we do have "a case in which the government is prohibiting a speaker from conveying information that the speaker already possesses." *Id.*, at 40. The difference is significant. An individual's right to speak is implicated when information he or she possesses is subjected to "restraints on the way in which the information might be used" or disseminated. *Seattle Times Co.* v. *Rhinehart*, 467 U. S. 20, 32 (1984); see also *Bartnicki* v. *Vopper*, 532 U. S. 514, 527 (2001); *Florida Star* v. *B. J. F.*, 491 U. S. 524 (1989); *New York Times Co.* v. *United States*, 403 U. S. 713 (1971) *(per curiam)*. In *Seattle Times*, this Court applied heightened judicial scrutiny before sustaining a trial court order prohibiting a newspaper's disclosure of information it learned through coercive discovery. It is true that the respondents here, unlike the newspaper in *Seattle Times*, do not themselves possess information whose disclosure has been curtailed. That information, however, is in the hands of pharmacies and other private entities. There is no question that the "threat of prosecution . . . hangs over their heads." *United Reporting*, 528 U. S., at 41. For that reason *United Reporting* does not bar respondents' facial challenge.

*United Reporting* is distinguishable for a second and even more important reason. The plaintiff in *United Reporting* had neither "attempt[ed] to qualify" for access to the government's information nor presented an as-applied claim in this Court. *Id.*, at 40. As a result, the Court assumed that the plaintiff had not suffered a personal First Amendment injury and could prevail only by invoking the rights of others through a facial challenge. Here, by contrast, the respondents claim—with good reason— that §4631(d) burdens their own speech. That argument finds support in the separate writings in *United Reporting*, which were joined by eight Justices. All of those writings recognized that restrictions on the disclosure of government-held information can facilitate or burden the

expression of potential recipients and so transgress the
First Amendment. See *id.*, at 42 (SCALIA, J., concurring)
(suggesting that "a restriction upon access that *allows*
access to the press . . . but at the same time *denies* access
to persons who wish to use the information for certain
speech purposes, is in reality a restriction upon speech");
*id.*, at 43 (GINSBURG, J., concurring) (noting that "the
provision of [government] information is a kind of subsidy
to people who wish to speak" about certain subjects, "and
once a State decides to make such a benefit available to
the public, there are no doubt limits to its freedom to
decide how that benefit will be distributed"); *id.*, at 46
(Stevens, J., dissenting) (concluding that, "because the
State's discrimination is based on its desire to prevent the
information from being used for constitutionally protected
purposes, [i]t must assume the burden of justifying its
conduct"). Vermont's law imposes a content- and speaker-
based burden on respondents' own speech. That consid-
eration provides a separate basis for distinguishing *United
Reporting* and requires heightened judicial scrutiny.

  The State also contends that heightened judicial scru-
tiny is unwarranted in this case because sales, transfer,
and use of prescriber-identifying information are conduct,
not speech. Consistent with that submission, the United
States Court of Appeals for the First Circuit has charac-
terized prescriber-identifying information as a mere "com-
modity" with no greater entitlement to First Amend-
ment protection than "beef jerky." *Ayotte*, 550 F. 3d, at
52–53. In contrast the courts below concluded that a
prohibition on the sale of prescriber-identifying informa-
tion is a content-based rule akin to a ban on the sale of
cookbooks, laboratory results, or train schedules. See 630
F. 3d, at 271–272 ("The First Amendment protects even
dry information, devoid of advocacy, political relevance, or
artistic expression" (internal quotation marks and altera-
tion omitted)); 631 F. Supp. 2d, at 445 ("A restriction on

disclosure is a regulation of speech, and the 'sale' of [information] is simply disclosure for profit").

This Court has held that the creation and dissemination of information are speech within the meaning of the First Amendment. See, *e.g.*, *Bartnicki, supra*, at 527 ("[I]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct" (some internal quotation marks omitted)); *Rubin* v. *Coors Brewing Co.*, 514 U. S. 476, 481 (1995) ("information on beer labels" is speech); *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, 472 U. S. 749, 759 (1985) (plurality opinion) (credit report is "speech"). Facts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs. There is thus a strong argument that prescriber-identifying information is speech for First Amendment purposes.

The State asks for an exception to the rule that information is speech, but there is no need to consider that request in this case. The State has imposed content- and speaker-based restrictions on the availability and use of prescriber-identifying information. So long as they do not engage in marketing, many speakers can obtain and use the information. But detailers cannot. Vermont's statute could be compared with a law prohibiting trade magazines from purchasing or using ink. Cf. *Minneapolis Star*, 460 U. S. 575. Like that hypothetical law, §4631(d) imposes a speaker- and content-based burden on protected expression, and that circumstance is sufficient to justify application of heightened scrutiny. As a consequence, this case can be resolved even assuming, as the State argues, that prescriber-identifying information is a mere commodity.

## B

In the ordinary case it is all but dispositive to conclude

that a law is content-based and, in practice, viewpoint-discriminatory. See *R. A. V.*, 505 U. S., at 382 ("Content-based regulations are presumptively invalid"); *id.*, at 391–392. The State argues that a different analysis applies here because, assuming §4631(d) burdens speech at all, it at most burdens only commercial speech. As in previous cases, however, the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied. See, *e.g.*, *Greater New Orleans Broadcasting Assn., Inc.* v. *United States*, 527 U. S. 173, 184 (1999). For the same reason there is no need to determine whether all speech hampered by §4631(d) is commercial, as our cases have used that term. Cf. *Board of Trustees of State Univ. of N. Y.* v. *Fox*, 492 U. S. 469, 474 (1989) (discussing whether "pure speech and commercial speech" were inextricably intertwined, so that "the entirety must . . . be classified as noncommercial").

Under a commercial speech inquiry, it is the State's burden to justify its content-based law as consistent with the First Amendment. *Thompson* v. *Western States Medical Center*, 535 U. S. 357, 373 (2002). To sustain the targeted, content-based burden §4631(d) imposes on protected expression, the State must show at least that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest. See *Fox, supra*, at 480–481; *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557, 566 (1980). There must be a "fit between the legislature's ends and the means chosen to accomplish those ends." *Fox, supra*, at 480 (internal quotation marks omitted). As in other contexts, these standards ensure not only that the State's interests are proportional to the resulting burdens placed on speech but also that the law does not seek to suppress a disfavored message. See *Turner Broadcasting*, 512 U. S., at 662–663.

The State's asserted justifications for §4631(d) come

under two general headings. First, the State contends that its law is necessary to protect medical privacy, including physician confidentiality, avoidance of harassment, and the integrity of the doctor-patient relationship. Second, the State argues that §4631(d) is integral to the achievement of policy objectives—namely, improved public health and reduced healthcare costs. Neither justification withstands scrutiny.

1

Vermont argues that its physicians have a "reasonable expectation" that their prescriber-identifying information "will not be used for purposes other than . . . filling and processing" prescriptions. See 2007 Vt. Laws No. 80, §1(29). It may be assumed that, for many reasons, physicians have an interest in keeping their prescription decisions confidential. But §4631(d) is not drawn to serve that interest. Under Vermont's law, pharmacies may share prescriber-identifying information with anyone for any reason save one: They must not allow the information to be used for marketing. Exceptions further allow pharmacies to sell prescriber-identifying information for certain purposes, including "health care research." §4631(e). And the measure permits insurers, researchers, journalists, the State itself, and others to use the information. See §4631(d); cf. App. 370–372; *id.*, at 211. All but conceding that §4631(d) does not in itself advance confidentiality interests, the State suggests that other laws might impose separate bars on the disclosure of prescriber-identifying information. See Vt. Bd. of Pharmacy Admin. Rule 20.1. But the potential effectiveness of other measures cannot justify the distinctive set of prohibitions and sanctions imposed by §4631(d).

Perhaps the State could have addressed physician confidentiality through "a more coherent policy." *Greater New Orleans Broadcasting*, *supra*, at 195; see also *Discovery*

*Network*, 507 U. S., at 428. For instance, the State might have advanced its asserted privacy interest by allowing the information's sale or disclosure in only a few narrow and well-justified circumstances. See, *e.g.*, Health Insurance Portability and Accountability Act of 1996, 42 U. S. C. §1320d–2; 45 CFR pts. 160 and 164 (2010). A statute of that type would present quite a different case than the one presented here. But the State did not enact a statute with that purpose or design. Instead, Vermont made prescriber-identifying information available to an almost limitless audience. The explicit structure of the statute allows the information to be studied and used by all but a narrow class of disfavored speakers. Given the information's widespread availability and many permissible uses, the State's asserted interest in physician confidentiality does not justify the burden that §4631(d) places on protected expression.

The State points out that it allows doctors to forgo the advantages of §4631(d) by consenting to the sale, disclosure, and use of their prescriber-identifying information. See §4631(c)(1). It is true that private decisionmaking can avoid governmental partiality and thus insulate privacy measures from First Amendment challenge. See *Rowan* v. *Post Office Dept.*, 397 U. S. 728 (1970); cf. *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60, 72 (1983). But that principle is inapposite here. Vermont has given its doctors a contrived choice: Either consent, which will allow your prescriber-identifying information to be disseminated and used without constraint; or, withhold consent, which will allow your information to be used by those speakers whose message the State supports. Section 4631(d) may offer a limited degree of privacy, but only on terms favorable to the speech the State prefers. Cf. *Rowan*, *supra*, at 734, 737, 739, n. 6 (sustaining a law that allowed private parties to make "unfettered," "unlimited," and "unreviewable" choices regarding their own privacy). This is not to say

that all privacy measures must avoid content-based rules. Here, however, the State has conditioned privacy on acceptance of a content-based rule that is not drawn to serve the State's asserted interest. To obtain the limited privacy allowed by §4631(d), Vermont physicians are forced to acquiesce in the State's goal of burdening disfavored speech by disfavored speakers.

Respondents suggest that a further defect of §4631(d) lies in its presumption of applicability absent a physician's election to the contrary. Vermont's law might burden less speech if it came into operation only after an individual choice, but a revision to that effect would not necessarily save §4631(d). Even reliance on a prior election would not suffice, for instance, if available categories of coverage by design favored speakers of one political persuasion over another. Rules that burden protected expression may not be sustained when the options provided by the State are too narrow to advance legitimate interests or too broad to protect speech. As already explained, §4631(d) permits extensive use of prescriber-identifying information and so does not advance the State's asserted interest in physician confidentiality. The limited range of available privacy options instead reflects the State's impermissible purpose to burden disfavored speech. Vermont's argument accordingly fails, even if the availability and scope of private election might be relevant in other contexts, as when the statute's design is unrelated to any purpose to advance a preferred message.

The State also contends that §4631(d) protects doctors from "harassing sales behaviors." 2007 Vt. Laws No. 80, §1(28). "Some doctors in Vermont are experiencing an undesired increase in the aggressiveness of pharmaceutical sales representatives," the Vermont Legislature found, "and a few have reported that they felt coerced and harassed." §1(20). It is doubtful that concern for "a few" physicians who may have "felt coerced and harassed" by

pharmaceutical marketers can sustain a broad content-based rule like §4631(d). Many are those who must endure speech they do not like, but that is a necessary cost of freedom. See *Erznoznik* v. *Jacksonville*, 422 U. S. 205, 210–211 (1975); *Cohen* v. *California*, 403 U. S. 15, 21 (1971). In any event the State offers no explanation why remedies other than content-based rules would be inadequate. See *44 Liquormart, Inc.* v. *Rhode Island*, 517 U. S. 484, 503 (1996) (opinion of Stevens, J.). Physicians can, and often do, simply decline to meet with detailers, including detailers who use prescriber-identifying information. See, *e.g.*, App. 180, 333–334. Doctors who wish to forgo detailing altogether are free to give "No Solicitation" or "No Detailing" instructions to their office managers or to receptionists at their places of work. Personal privacy even in one's own home receives "ample protection" from the "resident's unquestioned right to refuse to engage in conversation with unwelcome visitors." *Watchtower Bible & Tract Soc. of N. Y., Inc.* v. *Village of Stratton*, 536 U. S. 150, 168 (2002); see also *Bolger*, *supra*, at 72. A physician's office is no more private and is entitled to no greater protection.

Vermont argues that detailers' use of prescriber-identifying information undermines the doctor-patient relationship by allowing detailers to influence treatment decisions. According to the State, "unwanted pressure occurs" when doctors learn that their prescription decisions are being "monitored" by detailers. 2007 Vt. Laws No. 80, §1(27). Some physicians accuse detailers of "spying" or of engaging in "underhanded" conduct in order to "subvert" prescription decisions. App. 336, 380, 407–408; see also *id.*, at 326–328. And Vermont claims that detailing makes people "anxious" about whether doctors have their patients' best interests at heart. *Id.*, at 327. But the State does not explain why detailers' use of prescriber-identifying information is more likely to prompt these

objections than many other uses permitted by §4631(d). In any event, this asserted interest is contrary to basic First Amendment principles. Speech remains protected even when it may "stir people to action," "move them to tears," or "inflict great pain." *Snyder* v. *Phelps*, 562 U. S. ___, ___ (2011) (slip op., at 15). The more benign and, many would say, beneficial speech of pharmaceutical marketing is also entitled to the protection of the First Amendment. If pharmaceutical marketing affects treatment decisions, it does so because doctors find it persuasive. Absent circumstances far from those presented here, the fear that speech might persuade provides no lawful basis for quieting it. *Brandenburg* v. *Ohio*, 395 U. S. 444, 447 (1969) *(per curiam)*.

2

The State contends that §4631(d) advances important public policy goals by lowering the costs of medical services and promoting public health. If prescriber-identifying information were available for use by detailers, the State contends, then detailing would be effective in promoting brand-name drugs that are more expensive and less safe than generic alternatives. This logic is set out at length in the legislative findings accompanying §4631(d). Yet at oral argument here, the State declined to acknowledge that §4631(d)'s objective purpose and practical effect were to inhibit detailing and alter doctors' prescription decisions. See Tr. of Oral Arg. 5–6. The State's reluctance to embrace its own legislature's rationale reflects the vulnerability of its position.

While Vermont's stated policy goals may be proper, §4631(d) does not advance them in a permissible way. As the Court of Appeals noted, the "state's own explanation of how" §4631(d) "advances its interests cannot be said to be direct." 630 F. 3d, at 277. The State seeks to achieve its policy objectives through the indirect means of restraining

certain speech by certain speakers—that is, by diminishing detailers' ability to influence prescription decisions. Those who seek to censor or burden free expression often assert that disfavored speech has adverse effects. But the "fear that people would make bad decisions if given truthful information" cannot justify content-based burdens on speech. *Thompson*, 535 U. S., at 374; see also *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 769–770 (1976). "The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good." *44 Liquormart*, *supra*, at 503 (opinion of Stevens, J.); see also *Linmark Associates, Inc.* v. *Willingboro*, 431 U. S. 85, 97 (1977). These precepts apply with full force when the audience, in this case prescribing physicians, consists of "sophisticated and experienced" consumers. *Edenfield*, 507 U. S., at 775.

As Vermont's legislative findings acknowledge, the premise of §4631(d) is that the force of speech can justify the government's attempts to stifle it. Indeed the State defends the law by insisting that "pharmaceutical marketing has a strong influence on doctors' prescribing practices." Brief for Petitioners 49–50. This reasoning is incompatible with the First Amendment. In an attempt to reverse a disfavored trend in public opinion, a State could not ban campaigning with slogans, picketing with signs, or marching during the daytime. Likewise the State may not seek to remove a popular but disfavored product from the marketplace by prohibiting truthful, nonmisleading advertisements that contain impressive endorsements or catchy jingles. That the State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers.

The defect in Vermont's law is made clear by the fact that many listeners find detailing instructive. Indeed the record demonstrates that some Vermont doctors view

targeted detailing based on prescriber-identifying infor-
mation as "very helpful" because it allows detailers to
shape their messages to each doctor's practice. App. 274;
see also *id.*, at 181, 218, 271–272. Even the United States,
which appeared here in support of Vermont, took care to
dispute the State's "unwarranted view that the dangers
of [n]ew drugs outweigh their benefits to patients." Brief
for United States as *Amicus Curiae* 24, n. 4. There are di-
vergent views regarding detailing and the prescription
of brand-name drugs. Under the Constitution, resolution of
 that debate must result from free and uninhibited speech.
As one Vermont physician put it: "We have a saying in
medicine, information is power. And the more you know,
or anyone knows, the better decisions can be made." App.
279. There are similar sayings in law, including that
"information is not in itself harmful, that people will
perceive their own best interests if only they are well
enough informed, and that the best means to that end is
to open the channels of communication rather than to
close them." *Virginia Bd.*, 425 U. S., at 770. The choice
"between the dangers of suppressing information, and the
dangers of its misuse if it is freely available" is one that
"the First Amendment makes for us." *Ibid.*

Vermont may be displeased that detailers who use
prescriber-identifying information are effective in promot-
ing brand-name drugs. The State can express that view
through its own speech. See *Linmark*, 431 U. S., at 97; cf.
§4622(a)(1) (establishing a prescription drug educational
program). But a State's failure to persuade does not allow
it to hamstring the opposition. The State may not burden
the speech of others in order to tilt public debate in a
preferred direction. "The commercial marketplace, like
other spheres of our social and cultural life, provides a
forum where ideas and information flourish. Some of the
ideas and information are vital, some of slight worth. But
the general rule is that the speaker and the audience, not

the government, assess the value of the information presented." *Edenfield*, *supra*, at 767.

It is true that content-based restrictions on protected expression are sometimes permissible, and that principle applies to commercial speech. Indeed the government's legitimate interest in protecting consumers from "commercial harms" explains "why commercial speech can be subject to greater governmental regulation than noncommercial speech." *Discovery Network*, 507 U. S., at 426; see also *44 Liquormart*, 517 U. S., 502 (opinion of Stevens, J.). The Court has noted, for example, that "a State may choose to regulate price advertising in one industry but not in others, because the risk of fraud . . . is in its view greater there." *R. A. V.*, 505 U. S., at 388–389 (citing *Virginia Bd.*, *supra*, at 771–772). Here, however, Vermont has not shown that its law has a neutral justification.

The State nowhere contends that detailing is false or misleading within the meaning of this Court's First Amendment precedents. See *Thompson*, 535 U. S., at 373. Nor does the State argue that the provision challenged here will prevent false or misleading speech. Cf. *post*, at 10–11 (BREYER, J., dissenting) (collecting regulations that the government might defend on this ground). The State's interest in burdening the speech of detailers instead turns on nothing more than a difference of opinion. See *Bolger*, 463 U. S., at 69; *Thompson*, *supra*, at 376.

\*     \*     \*

The capacity of technology to find and publish personal information, including records required by the government, presents serious and unresolved issues with respect to personal privacy and the dignity it seeks to secure. In considering how to protect those interests, however, the State cannot engage in content-based discrimination to advance its own side of a debate.

If Vermont's statute provided that prescriber-identifying

information could not be sold or disclosed except in narrow circumstances then the State might have a stronger position. Here, however, the State gives possessors of the information broad discretion and wide latitude in disclosing the information, while at the same time restricting the information's use by some speakers and for some purposes, even while the State itself can use the information to counter the speech it seeks to suppress. Privacy is a concept too integral to the person and a right too essential to freedom to allow its manipulation to support just those ideas the government prefers.

When it enacted §4631(d), the Vermont Legislature found that the "marketplace for ideas on medicine safety and effectiveness is frequently one-sided in that brand-name companies invest in expensive pharmaceutical marketing campaigns to doctors." 2007 Vt. Laws No. 80, §1(4). "The goals of marketing programs," the legislature said, "are often in conflict with the goals of the state." §1(3). The text of §4631(d), associated legislative findings, and the record developed in the District Court establish that Vermont enacted its law for this end. The State has burdened a form of protected expression that it found too persuasive. At the same time, the State has left unburdened those speakers whose messages are in accord with its own views. This the State cannot do.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———

No. 10–779

———

## WILLIAM H. SORRELL, ATTORNEY GENERAL OF VERMONT, ET AL., PETITIONERS *v.* IMS HEALTH INC. ET AL.

*ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT*

[June 23, 2011]

JUSTICE BREYER, with whom JUSTICE GINSBURG and JUSTICE KAGAN join, dissenting.

The Vermont statute before us adversely affects expression in one, and only one, way. It deprives pharmaceutical and data-mining companies of data, collected pursuant to the government's regulatory mandate, that could help pharmaceutical companies create better sales messages. In my view, this effect on expression is inextricably related to a lawful governmental effort to regulate a commercial enterprise. The First Amendment does not require courts to apply a special "heightened" standard of review when reviewing such an effort. And, in any event, the statute meets the First Amendment standard this Court has previously applied when the government seeks to regulate commercial speech. For any or all of these reasons, the Court should uphold the statute as constitutional.

## I

The Vermont statute before us says pharmacies and certain other entities

> "shall not [1] sell . . . regulated records containing prescriber-identifiable information, nor [2] permit the use of [such] records . . . for marketing or promoting a prescription drug, unless the prescriber consents." Vt. Stat. Ann., Tit. 18, §4631(d) (Supp. 2010).

It also says that

> "[3] [p]harmaceutical manufacturers and pharmaceu-
> tical marketers shall not use prescriber-identifiable
> information for marketing or promoting a prescription
> drug unless the prescriber consents." *Ibid.*

For the most part, I shall focus upon the first and second
of these prohibitions. In Part IV, I shall explain why the
third prohibition makes no difference to the result.

## II

In *Glickman* v. *Wileman Brothers & Elliott, Inc.*, 521
U. S. 457 (1997), this Court considered the First Amend-
ment's application to federal agricultural commodity mar-
keting regulations that required growers of fruit to
make compulsory contributions to pay for collective adver-
tising. The Court reviewed the lawfulness of the regula-
tion's negative impact on the growers' freedom voluntarily
to choose their own commercial messages "under the
standard appropriate for the review of economic regula-
tion." *Id.*, at 469.

In this case I would ask whether Vermont's regulatory
provisions work harm to First Amendment interests that
is disproportionate to their furtherance of legitimate regu-
latory objectives. And in doing so, I would give significant
weight to legitimate commercial regulatory objectives—as
this Court did in *Glickman*. The far stricter, specially
"heightened" First Amendment standards that the major-
ity would apply to this instance of commercial regulation
are out of place here. *Ante*, at 1, 8, 9, 10, 11, 13, 14, 15.

### A

Because many, perhaps most, activities of human beings
living together in communities take place through speech,
and because speech-related risks and offsetting justifica-
tions differ depending upon context, this Court has distin-
guished for First Amendment purposes among different

contexts in which speech takes place. See, *e.g., Snyder* v. *Phelps*, 562 U. S. \_\_\_, \_\_\_–\_\_\_ (2011) (slip op., at 5–6). Thus, the First Amendment imposes tight constraints upon government efforts to restrict, *e.g.,* "core" political speech, while imposing looser constraints when the government seeks to restrict, *e.g.,* commercial speech, the speech of its own employees, or the regulation-related speech of a firm subject to a traditional regulatory program. Compare *Boos* v. *Barry*, 485 U. S. 312, 321 (1988) (political speech), with *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557 (1980) (commercial speech), *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563 (1968) (government employees), and *Glickman*, *supra* (economic regulation).

These test-related distinctions reflect the constitutional importance of maintaining a free marketplace of ideas, a marketplace that provides access to "social, political, esthetic, moral, and other ideas and experiences." *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 390 (1969); see *Abrams* v. *United States*, 250 U. S. 616, 630 (1919) (Holmes, J., dissenting). Without such a marketplace, the public could not freely choose a government pledged to implement policies that reflect the people's informed will.

At the same time, our cases make clear that the First Amendment offers considerably less protection to the maintenance of a free marketplace for goods and services. See *Florida Bar* v. *Went For It, Inc.*, 515 U. S. 618, 623 (1995) ("We have always been careful to distinguish commercial speech from speech at the First Amendment's core"). And they also reflect the democratic importance of permitting an elected government to implement through effective programs policy choices for which the people's elected representatives have voted.

Thus this Court has recognized that commercial speech including advertising has an "informational function" and

is not "valueless in the marketplace of ideas." *Central Hudson*, *supra*, at 563; *Bigelow* v. *Virginia*, 421 U. S. 809, 826 (1975). But at the same time it has applied a less than strict, "intermediate" First Amendment test when the government directly restricts commercial speech. Under that test, government laws and regulations may significantly restrict speech, as long as they also "directly advance" a "substantial" government interest that could not "be served as well by a more limited restriction." *Central Hudson*, *supra*, at 564. Moreover, the Court has found that "sales practices" that are "misleading, deceptive, or aggressive" lack the protection of even this "intermediate" standard. *44 Liquormart, Inc.* v. *Rhode Island*, 517 U. S. 484, 501 (1996) (opinion of Stevens, J.); see also *Central Hudson*, *supra*, at 563; *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 772 (1976). And the Court has emphasized the need, in applying an "intermediate" test, to maintain the

> "'commonsense' distinction between speech proposing a commercial transaction, *which occurs in an area traditionally subject to government regulation*, and other varieties of speech." *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 455–456 (1978) (quoting *Virginia Bd. of Pharmacy*, *supra*, at 771, n. 24; emphasis added).

The Court has also normally applied a yet more lenient approach to ordinary commercial or regulatory legislation that affects speech in less direct ways. In doing so, the Court has taken account of the need in this area of law to defer significantly to legislative judgment—as the Court has done in cases involving the Commerce Clause or the Due Process Clause. See *Glickman*, *supra*, at 475–476. "Our function" in such cases, Justice Brandeis said, "is only to determine the reasonableness of the legislature's belief in the existence of evils and in the effectiveness of

the remedy provided." *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 286–287 (1932) (dissenting opinion); *Williamson* v. *Lee Optical of Okla., Inc.*, 348 U. S. 483, 488 (1955) ("It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it"); *United States* v. *Carolene Products Co.*, 304 U. S. 144, 152 (1938) ("[R]egulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional" if it rests "upon some rational basis within the knowledge and experience of the legislators").

To apply a strict First Amendment standard virtually as a matter of course when a court reviews ordinary economic regulatory programs (even if that program has a modest impact upon a firm's ability to shape a commercial message) would work at cross-purposes with this more basic constitutional approach. Since ordinary regulatory programs can affect speech, particularly commercial speech, in myriad ways, to apply a "heightened" First Amendment standard of review whenever such a program burdens speech would transfer from legislatures to judges the primary power to weigh ends and to choose means, threatening to distort or undermine legitimate legislative objectives. See *Glickman*, 521 U. S., at 476 ("Doubts concerning the policy judgments that underlie" a program requiring fruit growers to pay for advertising they disagree with does not "justify reliance on the First Amendment as a basis for reviewing economic regulations"). Cf. *Johanns* v. *Livestock Marketing Assn.*, 544 U. S. 550, 560–562 (2005) (applying less scrutiny when the compelled speech is made by the Government); *United States* v. *United Foods, Inc.*, 533 U. S. 405, 411 (2001) (applying greater scrutiny where compelled speech was not "ancillary to a more comprehensive program restricting marketing autonomy"). To apply a "heightened" standard of review in such cases as a matter of course would risk what

then-Justice Rehnquist, dissenting in *Central Hudson*, described as a

> "retur[n] to the bygone era of *Lochner* v. *New York*, 198 U. S. 45 (1905), in which it was common practice for this Court to strike down economic regulations adopted by a State based on the Court's own notions of the most appropriate means for the State to implement its considered policies." 447 U. S., at 589.

### B

There are several reasons why the Court should review Vermont's law "under the standard appropriate for the review of economic regulation," not "under a heightened standard appropriate for the review of First Amendment issues." *Glickman,* 521 U. S., at 469. For one thing, Vermont's statute neither forbids nor requires anyone to say anything, to engage in any form of symbolic speech, or to endorse any particular point of view, whether ideological or related to the sale of a product. Cf. *id.*, at 469–470. (And I here assume that *Central Hudson* might otherwise apply. See Part III, *infra*.)

For another thing, the same First Amendment standards that apply to Vermont here would apply to similar regulatory actions taken by other States or by the Federal Government acting, for example, through Food and Drug Administration (FDA) regulation. (And the Federal Government's ability to pre-empt state laws that interfere with existing or contemplated federal forms of regulation is here irrelevant.)

Further, the statute's requirements form part of a traditional, comprehensive regulatory regime. Cf. *United Foods*, *supra*, at 411. The pharmaceutical drug industry has been heavily regulated at least since 1906. See Pure Food and Drugs Act, 34 Stat. 768. Longstanding statutes and regulations require pharmaceutical companies to engage in complex drug testing to ensure that their drugs

are both "safe" and "effective." 21 U. S. C. §§355(b)(1), 355(d). Only then can the drugs be marketed, at which point drug companies are subject to the FDA's exhaustive regulation of the content of drug labels and the manner in which drugs can be advertised and sold. §352(f)(2); 21 CFR pts. 201–203 (2010).

Finally, Vermont's statute is directed toward information that exists only by virtue of government regulation. Under federal law, certain drugs can be dispensed only by a pharmacist operating under the orders of a medical practitioner. 21 U. S. C. §353(b). Vermont regulates the qualifications, the fitness, and the practices of pharmacists themselves, and requires pharmacies to maintain a "patient record system" that, among other things, tracks who prescribed which drugs. Vt. Stat. Ann., Tit. 26, §§2041(a), 2022(14) (Supp. 2010); Vt. Bd. of Pharmacy Admin. Rules (Pharmacy Rules) 9.1, 9.24(e) (2009). But for these regulations, pharmacies would have no way to know who had told customers to buy which drugs (as is the case when a doctor tells a patient to take a daily dose of aspirin).

Regulators will often find it necessary to create tailored restrictions on the use of information subject to their regulatory jurisdiction. A car dealership that obtains credit scores for customers who want car loans can be prohibited from using credit data to search for new customers. See 15 U. S. C. §1681b (2006 ed. and Supp. III); cf. *Trans Union Corp.* v. *FTC*, 245 F. 3d 809, reh'g denied, 267 F. 3d 1138 (CADC 2001). Medical specialists who obtain medical records for their existing patients cannot purchase those records in order to identify new patients. See 45 CFR §164.508(a)(3) (2010). Or, speaking hypothetically, a public utilities commission that directs local gas distributors to gather usage information for individual customers might permit the distributors to share the data with researchers (trying to lower energy costs) but forbid

sales of the data to appliance manufacturers seeking to sell gas stoves.

Such regulatory actions are subject to judicial review, *e.g.,* for compliance with applicable statutes. And they would normally be subject to review under the Administrative Procedure Act to make certain they are not "arbitrary, capricious, [or] an abuse of discretion." 5 U. S. C. §706(2)(A) (2006 ed.). In an appropriate case, such review might be informed by First Amendment considerations. But regulatory actions of the kind present here have not previously been thought to raise serious additional constitutional concerns under the First Amendment. But cf. *Trans Union LLC* v. *FTC*, 536 U. S. 915 (2002) (KENNEDY, J., dissenting from denial of certiorari) (questioning ban on use of consumer credit reports for target marketing). The ease with which one can point to actual or hypothetical examples with potentially adverse speech-related effects at least roughly comparable to those at issue here indicates the danger of applying a "heightened" or "intermediate" standard of First Amendment review where typical regulatory actions affect commercial speech (say, by withholding information that a commercial speaker might use to shape the content of a message).

Thus, it is not surprising that, until today, this Court has *never* found that the *First Amendment* prohibits the government from restricting the use of information gathered pursuant to a regulatory mandate—whether the information rests in government files or has remained in the hands of the private firms that gathered it. But cf. *ante*, at 11–14. Nor has this Court *ever* previously applied any form of "heightened" scrutiny in any even roughly similar case. See *Los Angeles Police Dept.* v. *United Reporting Publishing Corp.*, 528 U. S. 32 (1999) (no heightened scrutiny); compare *Cincinnati* v. *Discovery Network, Inc.*, 507 U. S. 410, 426 (1993) ("[C]ommercial speech can be subject to greater governmental regulation than non-

commercial speech" because of the government's "interest in preventing commercial harms"), with *ante*, at 9–10, 11, 17–18, 24 (suggesting that *Discovery Network* supports heightened scrutiny when regulations target commercial speech).

C

The Court (suggesting a standard yet stricter than *Central Hudson*) says that we must give *content-based* restrictions that burden speech "heightened" scrutiny. It adds that "[c]ommercial speech is no exception." *Ante*, at 10–11. And the Court then emphasizes that this is a case involving both "content-based" and "speaker-based" restrictions. See *ante*, at 8, 9, 10, 12, 14, 15, 16, 19, 20, 22, 24.

But neither of these categories—"content-based" nor "speaker-based"—has ever before justified greater scrutiny when regulatory activity affects commercial speech. See, *e.g., Capital Broadcasting Co.* v. *Mitchell*, 333 F. Supp. 582 (DC 1971) (three-judge court), summarily aff'd *sub nom. Capital Broadcasting Co.* v. *Acting Attorney General*, 405 U. S. 1000 (1972) (upholding ban on radio and television marketing of tobacco). And the absence of any such precedent is understandable.

Regulatory programs necessarily draw distinctions on the basis of content. *Virginia Bd. of Pharmacy*, 425 U. S., at 761, 762 ("If there is a kind of commercial speech that lacks all First Amendment protection, . . . it must be distinguished by its content"). Electricity regulators, for example, oversee company statements, pronouncements, and proposals, but only about electricity. See, *e.g.,* Vt. Pub. Serv. Bd. Rules 3.100 (1983), 4.200 (1986), 5.200 (2004). The Federal Reserve Board regulates the content of statements, advertising, loan proposals, and interest rate disclosures, but only when made by financial institutions. See 12 CFR pts. 226, 230 (2011). And the FDA

oversees the form and content of labeling, advertising, and
sales proposals of drugs, but not of furniture. See 21 CFR
pts. 201–203. Given the ubiquity of content-based regula-
tory categories, why should the "content-based" nature of
typical regulation require courts (other things being equal)
to grant legislators and regulators *less* deference? Cf.
*Board of Trustees of State Univ. of N. Y.* v. *Fox*, 492 U. S.
469, 481 (1989) (courts, in First Amendment area, should
"provide the Legislative and Executive Branches needed
leeway" when regulated industries are at issue).

Nor, in the context of a regulatory program, is it un-
usual for particular rules to be "speaker-based," affecting
only a class of entities, namely, the regulated firms. An
energy regulator, for example, might require the manu-
facturers of home appliances to publicize ways to reduce
energy consumption, while exempting producers of indus-
trial equipment. See, *e.g.,* 16 CFR pt. 305 (2011) (prescrib-
ing labeling requirements for certain home appliances);
Nev. Admin. Code §§704.804, 704.808 (2010) (requiring
utilities to provide consumers with information on conser-
vation). Or a trade regulator might forbid a particular
firm to make the true claim that its cosmetic product
contains "cleansing grains that scrub away dirt and ex-
cess oil" unless it substantiates that claim with detailed
backup testing, even though opponents of cosmetics use
need not substantiate their claims. Morris, F. T. C. Or-
ders Data to Back Ad Claims, N. Y. Times, Nov. 3, 1973,
p. 32; Boys' Life, Oct. 1973, p. 64; see 36 Fed. Reg. 12058
(1971). Or the FDA might control in detail just what a
pharmaceutical firm can, and cannot, tell potential pur-
chasers about its products. Such a firm, for example,
could not suggest to a potential purchaser (say, a doctor)
that he or she might put a pharmaceutical drug to an "off
label" use, even if the manufacturer, in good faith and
with considerable evidence, believes the drug will help.
All the while, a third party (say, a researcher) is free to

tell the doctor not to use the drug for that purpose. See 21 CFR pt. 99; cf. *Buckman Co.* v. *Plaintiffs' Legal Comm.*, 531 U. S. 341, 350–351 (2001) (discussing effect of similar regulations in respect to medical devices); see also Proposed Rule, Revised Effectiveness Determination; Sunscreen Drug Products for Over-the-Counter Human Use, 76 Fed. Reg. 35672 (2011) (proposing to prohibit marketing of sunscreens with sun protection factor (SPF) of greater than 50 due to insufficient data "to indicate that there is additional clinical benefit").

If the Court means to create constitutional barriers to regulatory rules that might affect the *content* of a commercial message, it has embarked upon an unprecedented task—a task that threatens significant judicial interference with widely accepted regulatory activity. Cf., *e.g.,* 21 CFR pts. 201–203. Nor would it ease the task to limit its "heightened" scrutiny to regulations that only affect certain speakers. As the examples that I have set forth illustrate, many regulations affect only messages sent by a small class of regulated speakers, for example, electricity generators or natural gas pipelines.

The Court also uses the words "aimed" and "targeted" when describing the relation of the statute to drug manufacturers. *Ante*, at 8, 9, 12, 16. But, for the reasons just set forth, to require "heightened" scrutiny on this basis is to require its application early and often when the State seeks to regulate industry. Any statutory initiative stems from a legislative agenda. See, *e.g.,* Message to Congress, May 24, 1937, H. R. Doc. No. 255, 75th Cong., 1st Sess., 4 (request from President Franklin Roosevelt for legislation to ease the plight of factory workers). Any administrative initiative stems from a regulatory agenda. See, *e.g.,* Exec. Order No. 12866, 58 Fed. Reg. 51735 (1993) (specifying how to identify regulatory priorities and requiring agencies to prepare agendas). The related statutes, regulations, programs, and initiatives almost always reflect a

point of view, for example, of the Congress and the administration that enacted them and ultimately the voters. And they often aim at, and target, particular firms that engage in practices about the merits of which the Government and the firms may disagree. Section 2 of the Sherman Act, 15 U. S. C. §2, for example, which limits the truthful, nonmisleading speech of firms that, due to their market power, can affect the competitive landscape, is directly aimed at, and targeted at, monopolists.

In short, the case law in this area reflects the need to ensure that the First Amendment protects the "marketplace of ideas," thereby facilitating the democratic creation of sound government policies without improperly hampering the ability of government to introduce an agenda, to implement its policies, and to favor them to the exclusion of contrary policies. To apply "heightened" scrutiny when the regulation of commercial activities (which often involve speech) is at issue is unnecessarily to undercut the latter constitutional goal. The majority's view of this case presents that risk.

Moreover, given the sheer quantity of regulatory initiatives that touch upon commercial messages, the Court's vision of its reviewing task threatens to return us to a happily bygone era when judges scrutinized legislation for its interference with economic liberty. History shows that the power was much abused and resulted in the constitutionalization of economic theories preferred by individual jurists. See *Lochner* v. *New York*, 198 U. S. 45, 75–76 (1905) (Holmes, J., dissenting). By inviting courts to scrutinize whether a State's legitimate regulatory interests can be achieved in less restrictive ways whenever they touch (even indirectly) upon commercial speech, today's majority risks repeating the mistakes of the past in a manner not anticipated by our precedents. See *Central Hudson*, 447 U. S., at 589 (Rehnquist, J., dissenting); cf. *Railroad Comm'n of Tex.* v. *Rowan & Nichols Oil Co.*,

310 U. S. 573, 580–581 (1940) ("A controversy like this always calls for fresh reminder that courts must not substitute their notions of expediency and fairness for those which have guided the agencies to whom the formulation and execution of policy have been entrusted").

Nothing in Vermont's statute undermines the ability of persons opposing the State's policies to speak their mind or to pursue a different set of policy objectives through the democratic process. Whether Vermont's regulatory statute "targets" drug companies (as opposed to affecting them unintentionally) must be beside the First Amendment point.

This does not mean that economic regulation having some effect on speech is always lawful. Courts typically review the lawfulness of statutes for rationality and of regulations (if federal) to make certain they are not "arbitrary, capricious, [or] an abuse of discretion." 5 U. S. C. §706(2)(A). And our valuable free-speech tradition may play an important role in such review. But courts do not normally view these matters as requiring "heightened" First Amendment scrutiny—and particularly not the unforgiving brand of "intermediate" scrutiny employed by the majority. Because the imposition of "heightened" scrutiny in such instances would significantly change the legislative/judicial balance, in a way that would significantly weaken the legislature's authority to regulate commerce and industry, I would not apply a "heightened" First Amendment standard of review in this case.

III

Turning to the constitutional merits, I believe Vermont's statute survives application of *Central Hudson*'s "intermediate" commercial speech standard as well as any more limited "economic regulation" test.

A

The statute threatens only modest harm to commercial speech. I agree that it withholds from pharmaceutical companies information that would help those entities create a more effective selling message. But I cannot agree with the majority that the harm also involves unjustified discrimination in that it permits "pharmacies" to "share prescriber-identifying information with anyone for any reason" (but marketing). *Ante*, at 17. Whatever the First Amendment relevance of such discrimination, there is no evidence that it exists in Vermont. The record contains no evidence that prescriber-identifying data is widely disseminated. See App. 248, 255. Cf. *Burson* v. *Freeman*, 504 U. S. 191, 207 (1992) (plurality opinion) ("States adopt laws to address the problems that confront them. The First Amendment does not require States to regulate for problems that do not exist"); *Bates* v. *State Bar of Ariz.*, 433 U. S. 350, 380 (1977) ("[T]he justification for the application of overbreadth analysis applies weakly, if at all, in the ordinary commercial context").

The absence of any such evidence likely reflects the presence of other legal rules that forbid widespread release of prescriber-identifying information. Vermont's Pharmacy Rules, for example, define "unprofessional conduct" to include "[d]ivulging or revealing to unauthorized persons patient *or practitioner* information or the nature of professional pharmacy services rendered." Rule 20.1(i) (emphasis added); see also Reply Brief for Petitioners 21. The statute reinforces this prohibition where pharmaceutical marketing is at issue. And the exceptions that it creates are narrow and concern common and often essential uses of prescription data. See Vt. Stat. Ann., Tit. 18, §4631(e)(1) (pharmacy reimbursement, patient care management, health care research); §4631(e)(2) (drug dispensing); §4631(e)(3) (communications between prescriber and pharmacy); §4631(e)(4) (information to pa-

tients); §§4631(e)(5)–(6) (as otherwise provided by state or federal law). Cf. *Trans Union Corp.*, 245 F. 3d, at 819 (rejecting an underinclusiveness challenge because an exception to the Fair Credit Reporting Act concerned "'exactly the sort of thing the Act seeks to promote'" (quoting *Trans Union Corp.* v. *FTC*, 81 F. 3d 228, 234 (CADC 1996)).

Nor can the majority find record support for its claim that the statute helps "favored" speech and imposes a "burde[n]" upon "disfavored speech by disfavored speakers." *Ante*, at 19. The Court apparently means that the statute (1) prevents pharmaceutical companies from creating individualized messages that would help them sell their drugs more effectively, but (2) permits "counterdetailing" programs, which often promote generic drugs, to create such messages using prescriber-identifying data. I am willing to assume, for argument's sake, that this consequence would significantly increase the statute's negative impact upon commercial speech. But cf. 21 CFR §§202.1(e)(1), 202.1(e)(5)(ii) (FDA's "fair balance" requirement); App. 193 (no similar FDA requirement for nondrug manufacturers). The record before us, however, contains no evidentiary basis for the conclusion that any such individualized counterdetailing is widespread, or exists at all, in Vermont.

The majority points out, *ante*, at 4, that Act 80, of which §4631 was a part, also created an "evidence-based prescription drug education program," in which the Vermont Department of Health, the Department of Vermont Health Access, and the University of Vermont, among others, work together "to provide information and education on the therapeutic and cost-effective utilization of prescription drugs" to health professionals responsible for prescribing and dispensing prescription drugs, Vt. Stat. Ann., Tit. 18, §4622(a)(1). See generally §§4621–4622. But that program does *not* make use of prescriber-identifying data.

Reply Brief for Petitioners 11.

The majority cites testimony by two witnesses in support of its statement that "States themselves may supply the prescriber-identifying information used in [counterdetailing] programs." *Ante*, at 4. One witness explained that academic detailers *in Pennsylvania* work with state health officials to identify physicians serving patients whose health care is likewise state provided. App. 375. The other, an IMS Health officer, observed that Vermont has its own multipayer database containing prescriber-identifying data, which *could* be used to talk to doctors about their prescription patterns and the lower costs associated with generics. *Id.*, at 313. But nothing in the record indicates that any "counterdetailing" of this kind *has ever taken place in fact in Vermont*. State-sponsored health care professionals sometimes meet with small groups of doctors to discuss best practices and generic drugs generally. See University of Vermont, College of Medicine, Office of Primary Care, Vermont Academic Detailing Program (July 2010), http://www.med.uvm.edu/ahec/downloads/VTAD_overview_2010.07.08.pdf (all Internet materials as visited June 21, 2011, and available in Clerk of Court's case file). Nothing in Vermont's statute prohibits brand-name manufacturers from undertaking a similar effort.

The upshot is that the only commercial-speech-related harm that the record shows this statute to have brought about is the one I have previously described: The withholding of information collected through a regulatory program, thereby preventing companies from shaping a commercial message they believe maximally effective. The absence of precedent suggesting that this kind of harm is serious reinforces the conclusion that the harm here is modest at most.

## B

The legitimate state interests that the statute serves are "substantial." *Central Hudson*, 447 U. S., at 564. Vermont enacted its statute

> "to advance the state's interest in protecting the public health of Vermonters, protecting the privacy of prescribers and prescribing information, and to ensure costs are contained in the private health care sector, as well as for state purchasers of prescription drugs, through the promotion of less costly drugs and ensuring prescribers receive unbiased information." §4631(a).

These objectives are important. And the interests they embody all are "neutral" in respect to speech. Cf. *ante*, at 24.

The protection of public health falls within the traditional scope of a State's police powers. *Hillsborough County* v. *Automated Medical Laboratories, Inc.*, 471 U. S. 707, 719 (1985). The fact that the Court normally exempts the regulation of "misleading" and "deceptive" information even from the rigors of its "intermediate" commercial speech scrutiny testifies to the importance of securing "unbiased information," see *44 Liquormart*, 517 U. S., at 501 (opinion of Stevens, J.); *Central Hudson*, *supra*, at 563, as does the fact that the FDA sets forth as a federal regulatory goal the need to ensure a "fair balance" of information about marketed drugs, 21 CFR §§202.1(e)(1), 202.1(e)(5)(ii). As major payers in the health care system, health care spending is also of crucial state interest. And this Court has affirmed the importance of maintaining "privacy" as an important public policy goal—even in respect to information already disclosed to the public for particular purposes (but not others). See *Department of Justice* v. *Reporters Comm. for Freedom of Press*, 489 U. S. 749, 762–771 (1989); see also Solove, A Taxonomy of Pri-

vacy, 154 U. Pa. L. Rev. 477, 520–522 (2006); cf. *NASA* v. *Nelson*, 562 U. S. \_\_\_, \_\_\_–\_\_\_ (2011) (slip op., at 8–9) (discussing privacy interests in nondisclosure).

At the same time, the record evidence is sufficient to permit a legislature to conclude that the statute "directly advances" each of these objectives. The statute helps to focus sales discussions on an individual drug's safety, effectiveness, and cost, perhaps compared to other drugs (including generics). These drug-related facts have everything to do with general information that drug manufacturers likely possess. They have little, if anything, to do with the name or prior prescription practices of the particular doctor to whom a detailer is speaking. Shaping a detailing message based on an individual doctor's prior prescription habits may help sell more of a particular manufacturer's particular drugs. But it does so by diverting attention from scientific research about a drug's safety and effectiveness, as well as its cost. This diversion comes at the expense of public health and the State's fiscal interests.

Vermont compiled a substantial legislative record to corroborate this line of reasoning. See Testimony of Sean Flynn (Apr. 11, 2007), App. in No. 09–1913–cv(L) etc. (CA2), p. A–1156 (hereinafter CA2 App.) (use of data mining helps drug companies "to cover up information that is not in the best of light of their drug and to highlight information that makes them look good"); Volker & Outterson, New Legislative Trends Threaten the Way Health Information Companies Operate, Pharmaceutical Pricing & Reimbursement 2007, *id.*, at A–4235 (one former detailer considered prescriber-identifying data the "'greatest tool in planning our approach to manipulating doctors'" (quoting Whitney, Big (Brother) Pharma: How Drug Reps Know Which Doctors to Target, New Republic, Aug. 29, 2006, http://www.tnr.com/article/84056/health-care-eli-lilly-pfizer-ama); Testimony of Paul Harrington

(May 3, 2007), *id.*, at A–1437 (describing data mining practices as "secret and manipulative activities by the marketers"); Testimony of Julie Brill (May 3, 2007), *id.*, at A–1445 (restrictions on data mining "ensur[e] that the FDA's requirement of doctors receiving fair and balanced information actually occurs"); Written Statement of Jerry Avorn & Aaron Kesselheim, *id.*, at A–4310 (citing studies that "indicate that more physician-specific detailing will lead to more prescriptions of brand-name agents, often with no additional patient benefit but at much higher cost to patients and to state-based insurance programs, which will continue to drive up the cost of health care"); *id.*, at 4311 ("Making it more difficult for manufacturers to tailor their marketing strategies to the prescribing histories of individual physicians would actually encourage detailers to present physicians with a more neutral description of the product"); see also Record in No. 1:07–cv–00188–jgm (D Vt.), Doc. 414, pp. 53–57, 64 (hereinafter Doc. 414) (summarizing record evidence).

These conclusions required the legislature to make judgments about whether and how to ameliorate these problems. And it is the job of regulatory agencies and legislatures to make just these kinds of judgments. Vermont's attempts to ensure a "fair balance" of information is no different from the FDA's similar requirement, see 21 CFR §§202.1(e)(1), 202.1(e)(5)(ii). No one has yet suggested that substantial portions of federal drug regulation are unconstitutional. Why then should we treat Vermont's law differently?

The record also adequately supports the State's privacy objective. Regulatory rules in Vermont make clear that the confidentiality of an individual doctor's prescribing practices remains the norm. See, *e.g.,* Pharmacy Rule 8.7(c) ("Prescription and other patient health care information shall be secure from access by the public, and the information shall be kept confidential"); Pharmacy Rule

20.1(i) (forbidding disclosure of patient or prescriber information to "unauthorized persons" without consent). Exceptions to this norm are comparatively few. See, *e.g., ibid.* (identifying "authorized persons"); Vt. Stat. Ann., Tit. 18, §4631(e); App. 248, 255 (indicating that prescriber-identifying data is not widely disseminated). There is no indication that the State of Vermont, or others in the State, makes use of this information for counterdetailing efforts. See *supra*, at 15.

Pharmaceutical manufacturers and the data miners who sell information to those manufacturers would like to create (and did create) an additional exception, which means additional circulation of otherwise largely confidential information. Vermont's statute closes that door. At the same time, the statute permits doctors who wish to permit use of their prescribing practices to do so. §§4631(c)–(d). For purposes of *Central Hudson*, this would seem sufficiently to show that the statute serves a meaningful interest in increasing the protection given to prescriber privacy. See *Fox*, 492 U. S., at 480 (in commercial speech area, First Amendment requires "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served" (internal quotation marks omitted)); see also *United States* v. *Edge Broadcasting Co.*, 509 U. S. 418, 434 (1993) (The First Amendment does not "require that the Government make progress on every front before it can make progress on any front"); *Burson*, 504 U. S., at 207 (plurality opinion).

## C

The majority cannot point to any adequately supported, similarly effective "more limited restriction." *Central Hudson*, 447 U. S., at 564. It says that doctors "can, and often do, simply decline to meet with detailers." *Ante*, at 20. This fact, while true, is beside the point. Closing the

office door entirely has no similar tendency to lower costs (by focusing greater attention upon the comparative advantages and disadvantages of generic drug alternatives). And it would not protect the confidentiality of information already released to, say, data miners. In any event, physicians are unlikely to turn detailers away at the door, for those detailers, whether delivering a balanced or imbalanced message, are nonetheless providers of much useful information. See Manchanda & Honka, The Effects and Role of Direct-to-Physician Marketing in the Pharmaceutical Industry: An Integrative Review, 5 Yale J. Health Pol'y L. & Ethics 785, 793–797, 815–816 (2005); Ziegler, Lew, & Singer, The Accuracy of Drug Information from Pharmaceutical Sales Representatives, 273 JAMA 1296 (1995). Forcing doctors to choose between targeted detailing and no detailing at all could therefore jeopardize the State's interest in promoting public health.

The majority also suggests that if the "statute provided that prescriber-identifying information could not be sold or disclosed except in narrow circumstances then the State might have a stronger position." *Ante*, at 24–25; see also *ante*, at 17. But the disclosure-permitting exceptions here *are* quite narrow, and they serve useful, indeed essential purposes. See *supra*, at 14. Compare Vt. Stat. Ann., Tit. 18, §4631(e) with note following 42 U. S. C. §1320d–2, p. 1190, and 45 CFR §164.512 (uses and disclosures not requiring consent under the Health Insurance Portability and Accountability Act of 1996). Regardless, this alternative is not "a *more limited* restriction," *Central Hudson*, *supra*, at 564 (emphasis added), for it would impose a *greater*, not a *lesser*, burden upon the dissemination of information.

Respondents' alternatives are no more helpful. Respondents suggest that "Vermont can simply inform physicians that pharmaceutical companies . . . use prescription history information to communicate with doctors." Brief for

Respondent Pharmaceutical Research and Manufacturers of America 48. But how would that help serve the State's basic purposes? It would not create the "fair balance" of information in pharmaceutical marketing that the State, like the FDA, seeks. Cf. *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 874 (1997) (alternative must be "at least as effective in achieving the legitimate purpose that the statute was enacted to serve"). Respondents also suggest policies requiring use of generic drugs or educating doctors about their benefits. Brief for Respondent Pharmaceutical Research and Manufacturers of America 54–55. Such programs have been in effect for some time in Vermont or other States, without indication that they have prevented the imbalanced sales tactics at which Vermont's statute takes aim. See, *e.g.,* Written Statement of Jerry Avorn & Aaron Kesselheim, CA2 App. 4310; Doc. 414, at 60–61. And in any event, such laws do not help protect prescriber privacy.

Vermont has thus developed a record that sufficiently shows that its statute meaningfully furthers substantial state interests. Neither the majority nor respondents suggests any equally effective "more limited" restriction. And the First Amendment harm that Vermont's statute works is, at most, modest. I consequently conclude that, even if we apply an "intermediate" test such as that in *Central Hudson,* this statute is constitutional.

## IV

What about the statute's third restriction, providing that "[p]harmaceutical manufacturers and pharmaceutical marketers" may not "*use* prescriber-identifiable information for marketing or promoting a prescription drug unless the prescriber consents"? Vt. Stat. Ann., Tit. 18, §4631(d) (emphasis added). In principle, I should not reach this question. That is because respondent pharmaceutical manufacturers, marketers, and data miners seek a de-

claratory judgment and injunction prohibiting the en-
forcement of this statute. See 28 U. S. C. §2201; App. 49–
128. And they have neither shown nor claimed that they
could obtain significant amounts of "prescriber-identifiable
information" if the first two prohibitions are valid. If, as
I believe, the first two statutory prohibitions (related to
selling and disclosing the information) are valid, then
the dispute about the validity of the third provision is
not "'real and substantial'" or "'definite and concrete.'"
*MedImmune, Inc.* v. *Genentech, Inc.*, 549 U. S. 118, 127
(2007) (quoting *Aetna Life Ins. Co.* v. *Haworth*, 300 U. S.
227, 240–241 (1937)) (Article III does not permit courts to
entertain such disputes).

The Court, however, strikes down all three provisions,
and so I add that I disagree with the majority as to the
constitutionality of the third restriction as well—basically
for the reasons I have already set out. The prohibition
against pharmaceutical firms using this prescriber-
identifying information works no more than modest First
Amendment harm; the prohibition is justified by the need
to ensure unbiased sales presentations, prevent unneces-
sarily high drug costs, and protect the privacy of prescrib-
ing physicians. There is no obvious equally effective, more
limited alternative.

## V

In sum, I believe that the statute before us satisfies the
"intermediate" standards this Court has applied to restric-
tions on commercial speech. *A fortiori* it satisfies less
demanding standards that are more appropriately applied
in this kind of commercial regulatory case—a case where
the government seeks typical regulatory ends (lower drug
prices, more balanced sales messages) through the use of
ordinary regulatory means (limiting the commercial use
of data gathered pursuant to a regulatory mandate). The
speech-related consequences here are indirect, incidental,

and entirely commercial.  See *supra*, at 6–9.

The Court reaches its conclusion through the use of important First Amendment categories—"content-based," "speaker-based," and "neutral"—but without taking full account of the regulatory context, the nature of the speech effects, the values these First Amendment categories seek to promote, and prior precedent.  See *supra*, at 2–6, 9–13, 17.  At best the Court opens a Pandora's Box of First Amendment challenges to many ordinary regulatory practices that may only incidentally affect a commercial message.  See, *e.g., supra*, at 7–8, 9–11.  At worst, it re-awakens *Lochner*'s pre-New Deal threat of substituting judicial for democratic decisionmaking where ordinary economic regulation is at issue.  See *Central Hudson*, 447 U. S., at 589 (Rehnquist, J., dissenting).

Regardless, whether we apply an ordinary commercial speech standard or a less demanding standard, I believe Vermont's law is consistent with the First Amendment. And with respect, I dissent.