FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MICHELE SANTOPIETRO, | No. 14-16324 |
| *Plaintiff-Appellant*, | D.C. No. 2:12-cv-01648-JCM-PAL |
| v. | |
| CLAYBORN HOWELL, Las Vegas Metropolitan Police Department Officer, Badge 9034; KRISTINE CRAWFORD, Las Vegas Metropolitan Police Officer, Badge 10050; FRANCISCO LOPEZ-ROSENDE, Las Vegas Metropolitan Police Department Officer, Badge 8864, | ORDER AND AMENDED OPINION |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted July 8, 2016
San Francisco, California

Filed May 24, 2017
Amended July 18, 2023

Before:  Marsha S. Berzon and N. Randy Smith, Circuit Judges, and Dana L. Christensen,[*] District Judge.

Order;
Opinion by Judge Berzon

## SUMMARY[**]

### Civil Rights/First Amendment

The panel filed (1) an order denying a petition for panel rehearing, denying a petition for rehearing en banc, and amending the opinion filed on May 24, 2017; and (2) an amended opinion reversing in part the district court's summary judgment in favor of Las Vegas Metropolitan Police Department officers and remanding, in an action brought by a street performer who alleged she was unlawfully arrested for conducting business with another performer without a license on the Las Vegas Strip, in violation of her First Amendment rights.

Plaintiff and her friend, both dressed in "sexy cop" costumes, posed with pedestrians on the Strip and accepted tips in exchange for photos. Defendant police officers, working a plain-clothes Strip enforcement assignment, arrested plaintiff and her friend for doing business without a license after the officers were asked to pay a tip or delete a

---

[*] The Honorable Dana L. Christensen, United States District Judge for the District of Montana, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

photo. The charges against plaintiff were ultimately dropped.

Viewing the record most favorably to plaintiff, the panel assumed that it was plaintiff's friend who asked that the officers pay a tip or delete the photo. The panel concluded that the First Amendment protections accorded to plaintiff's own activities did not lapse because of what her friend said or did without plaintiff's direct participation. There was no evidence at all, for example, of a prior agreement between the women to require a quid-pro-quo payment for posing in photos, nor of a demonstrated pattern of demanding quid-pro-quo payments during performances together. The panel held that plaintiff associated with her friend only for expressive activity protected under *Berger v. City of Seattle*, 569 F.3d 1029 (9th Cir. 2009) (en banc), and that the district court erred by deciding that the officers had probable cause to arrest plaintiff despite the First Amendment protections afforded to her expressive association.

As to the denial of partial summary judgment to plaintiff, the panel remanded for a determination after trial of the disputed factual issues and for consideration in light of the panel's opinion as to whether, on the facts thus determined, plaintiff was validly arrested for her own statements and actions.

## COUNSEL

Andrew M. Jacobs (argued), Snell & Wilmer LLP, Phoenix, Arizona; Kelly H. Dove, Snell & Wilmer LLP, Las Vegas, Nevada; for Plaintiff-Appellant.

Nicholas Crosby (argued) and Marquis Aurbach Coffing, Marquis Aurbach Chtd., Las Vegas, Nevada; Thomas William Stewart, The Powell Law Firm, Las Vegas, Nevada, for Defendants-Appellees.

## ORDER

The opinion filed May 24, 2017, and reported at 857 F.3d 980 (9th Cir. 2017), is hereby amended. An amended opinion is filed concurrently with this order.

The panel has unanimously voted to deny the petition for rehearing. The panel unanimously recommends denial of the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing and the petition for rehearing en banc are denied. The motion for determination of the petition is denied as moot. No further petitions for rehearing or rehearing en banc will be entertained.

## OPINION

BERZON, Circuit Judge:

Las Vegas Metropolitan Police Department ("Metro") officers arrested Michele Santopietro, a street performer, for conducting business without a license on the Las Vegas Strip. We consider the constitutionality of her arrest.

## BACKGROUND

### I.  Santopietro's Arrest

The various people involved in the incident that led to Santopietro's arrest provided versions of the events that vary somewhat but, as will appear, are mostly consistent as they relate to the constitutional issues Santopietro raises in this litigation. We recount here both the areas of agreement and those of discord.

Michele Santopietro is an actress who occasionally engages in street performance. On several occasions, Santopietro and her friend, Lea Patrick, traveled to Las Vegas from California and performed together as "sexy cops" on the Las Vegas Strip (the "Strip").

On May 27, 2011, Santopietro flew to Las Vegas to meet Patrick. The next day, the two women set about presenting their "sexy cop" routine. Less than an hour into their performance they were approached by three Metro officers—Clayborn Howell, Kristine Crawford, and Francisco Lopez-Rosende (together, "Officers")—who were patrolling the Strip in plain clothes.

Howell spoke first, asking Santopietro and Patrick, "How much does a picture cost?" According to Santopietro, she replied, "It doesn't cost anything. We just ask for a tip,"

to which Patrick added, "We pose for tips. Is that okay?"[1] Howell responded, "okay," posed for a picture with Santopietro and Patrick, and, after Crawford snapped a shot, told the two "sexy cops" he was "going to go get the money for the tip."[2]

But he did not. Instead, Howell slowly moved a few steps away from Santopietro and Patrick, offering no payment. Although Patrick reminded Howell, "don't forget the tip," none was offered. Patrick reiterated: "You said you would tip," whereupon Howell made clear that no gratuity was in store. At that point, either Patrick or Santopietro asked Crawford to delete the photo from her camera if Howell was unhappy with it or, according to the Officers, if he was not going to tip. The parties dispute the characterization of the statement, as well as of others assertedly made by Patrick. Specifically, they disagree as to whether the statements were made as polite requests or as "demands"—albeit, the Officers concede, "non- coercive" ones.

Crawford then approached Santopietro and queried, "And what are you going to do to my camera if I don't give you a tip?" Santopietro's reply was, "I'm not going to do anything to your camera. I'm not going to touch you. What exactly are you trying to get me to say?" Meanwhile, Howell

---

[1] Officer Howell's arrest report states that the "females," without differentiating between them, said, "We work for tips. Is that OK?" In his deposition, Howell clarified that Patrick, not Santopietro, made that statement. The Officers understood the initial statement(s) regarding posing or working for tips as requesting voluntary tips.

[2] Lopez-Rosende did not believe that Howell affirmatively stated he would give a tip, and he denied that the three Officers had agreed on such a communication. Crawford did not know whether Howell agreed to tip but did not dispute Howell's testimony that he did.

told Patrick she could not demand a tip, and Patrick responded, "You're absolutely right, I can't demand a tip. I just said that you said you would tip." Patrick also told Howell he had entered into a "verbal agreement" or "verbal contract" to tip her.

Either seconds before or immediately after Patrick mentioned the verbal agreement, Howell lifted his shirt to reveal his Metro badge to Patrick and Santopietro. One or more of the Officers then proceeded to handcuff the "sexy cops." According to Patrick and Santopietro, just Patrick was handcuffed at first; Santopietro was handcuffed only after she said, "You can't arrest [Patrick]; she hasn't done anything wrong." Crawford agreed with this sequence, testifying in her deposition that Officer Lopez-Rosende, the third Metro officer at the scene, took umbrage at Santopietro's remark and handcuffed her after she made it.

According to Santopietro, she twice protested, as she was being placed in handcuffs, that she had not said anything to the Officers to justify her arrest. Crawford did not recall Santopietro making such a statement, but she agreed that Lopez-Rosende said something to the effect of, "I'll tell you right now it doesn't matter. You're here doing business together, dressed alike, so you don't have to say anything."

Whatever precisely was said and whoever said it, the Officers arrested Santopietro and Patrick for doing business without a license in violation of Clark County Code § 6.56.030. That section provides: "It is unlawful for any person, in the unincorporated areas of the county to operate or conduct business as a temporary store, professional promoter or peddler, solicitor or canvasser without first having procured a license for the same . . . ." The charges against Santopietro eventually were dropped.

## II.  2010 Memorandum of Understanding

Santopietro and Patrick were by no means the first street performers arrested by Metro officers. Most notably, as a result of repeated arrests and citations made for street performance activities, two street performers sued Metro (and other government entities and officials) in 2009 to prevent similar future arrests and citations, alleging that such enforcement of Clark County Code § 6.56.030 and related ordinances violates the First Amendment.

To settle that suit, the parties, including Metro, agreed to an Interim Stipulated Memorandum of Understanding ("MOU") in 2010. The MOU (1) specified that the sidewalks and pedestrian bridges along the Strip constitute a traditional public forum; (2) defined "street performer" as "a member of the general public who engages in any performing art or the playing of any musical instrument, singing or vocalizing, with or without musical accompaniment, and whose performance is not an official part of a sponsored event"; and (3) recognized that this court held in *Berger v. City of Seattle*, 569 F.3d 1029 (9th Cir. 2009) (en banc), "that street performing is expressive speech or expressive conduct protected under the First Amendment." The MOU went on to provide that "[s]treet performing, including the acceptance of unsolicited tips and the non-coercive solicitation of tips, is not a *per se* violation of any of the codes or statutes being challenged in [the] action," which included Chapter 6 of the Clark County Code. The MOU also recited that "[t]he entirety of Chapter 6 of the Clark County Code, the business licensing codes, as written, is inapplicable to the act of street performing." At the same time, the MOU cautioned that "[s]treet performers who are legitimately in violation of a county code, state statute, or

other law of general applicability are not immune from prosecution simply because they are street performers."

All three of the defendant Officers in this case had received guidance or training concerning the MOU before Santopietro was arrested. The Officers reported that their principal takeaway from the training was that street performing without a license is not a crime, so long as no "demands" for compensation are made.

### III.  Procedural History

Santopietro sued Howell, Crawford, and Lopez-Rosende, asserting eleven federal and state causes of action. Invoking 42 U.S.C. § 1983, she alleged violations of her First Amendment free speech rights; Fourth Amendment right to be free from unreasonable search and seizure; and Fourteenth Amendment substantive and procedural due process and equal protection rights. Santopietro also asserted several causes of action based on state constitutional rights. She sought declaratory and injunctive relief, as well as damages for injuries suffered during detention and attorney's fees. After discovery, the Officers filed a motion for summary judgment. Santopietro filed a cross-motion for partial summary judgment on her § 1983 claim that the arrest violated her First Amendment rights.

The district court granted the Officers' summary judgment motion and denied Santopietro's. Concluding that the Officers had probable cause to arrest Santopietro for doing business without a license, the district court maintained that, for that reason, Santopietro's arrest was in all respects constitutional. In the district court's view, "the [O]fficers did not arrest Santopietro because she was a street performer who was soliciting tips in a non-coercive manner," but because the Officers reasonably had

determined that "Patrick, *and by association*, Santopietro[,] were no longer acting as street performers, but . . . were conducting business without a license as prohibited by [Clark Cty. Mun. Code] § 6.56.030."**[3]** (Emphasis added).

Without addressing any First Amendment concerns, the district court held that "the offense of doing business without a license was completed as soon as Santopietro and her partner offered to perform a service in exchange for compensation"; the Officers did not need to wait to "arrest until a tip was demanded several times." Rather, the district court opined, "it is reasonable for an officer to believe that tipping has become involuntary (and thus coerced) when a street performer reminds someone to tip, demands a tip, and asserts that a verbal contract exists that necessitates payment of a tip." As the district court recognized, however, none of those actions were completed by Santopietro; only "Patrick engaged in . . . [that] kind of conduct."

---

[3] Chapter 6 of the Clark County Code defines peddlers as:

> All hawkers, street vendors, and door-to-door sellers of goods, wares, merchandise, or services for immediate performance or delivery, sellers of entertainment or sporting event tickets, mobile food vendors (Chapter 6.130) and traveling manufacturers, but not solicitors or canvassers. . . . Peddling is complete when offer is communicated to any individual then located within the unincorporated area of Clark County.

Clark Cty. Mun. Code § 6.56.010. A later subsection makes it "unlawful for any person, in the unincorporated areas of the county to operate or conduct business as a . . . peddler, solicitor or canvasser without first having procured a license for the same . . . ." *Id.* § 6.56.030

Santopietro timely appealed both the grant of summary judgment to the Officers and the denial of her motion for partial summary judgment.[4]

## DISCUSSION

Santopietro asserts that at the time of her arrest she was engaged only in fully First Amendment-protected street performance, which includes the non- coercive solicitation of tips. *See Berger*, 569 F.3d at 1035, 1050. She further maintains that the Officers had no legal basis for arresting her on the basis of Patrick's statements simply because they were performing together. Moreover, Patrick's statements, she argues, could not themselves support probable cause under the applicable municipal ordinance because they (1) did not constitute an "offer" to perform a service, and (2) were constitutionally protected as part of her street performance. For all those reasons, Santopietro contends, the Officers violated her constitutional rights by arresting her.

Taking a similar approach to that of the district court, the Officers argue that they had probable cause to arrest Santopietro for violating section 6.56.030 of the Clark County Code, primarily because of her association with Patrick. It was reasonable to conclude, the Officers maintain, that the two women were engaged in the business of peddling without a license to do so.

---

[4] In her complaint, Santopietro claimed the arrest violated not only her First Amendment rights but also her Fourth Amendment rights to be free from unreasonable seizure. On appeal, she argues only that the arrest violated her rights under the First Amendment, so we limit this opinion to that issue.

## I.  Constitutional Violation

We consider first the district court's grant of summary judgment to the Officers and conclude it was in error, because it misconceived the scope of the applicable First Amendment protections.

The pivotal role of probable cause analysis in *Fourth* Amendment jurisprudence is, of course, well-established. As pertinent here, "a warrantless arrest by a law [enforcement] officer is reasonable . . . where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may . . . arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). But "[police] may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1020 (9th Cir. 2015) (quoting *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990)). Where no specific criminal statute validly applies to the facts at hand, an arrest is not supported by probable cause.

Our principal question, then, is whether it is constitutionally permissible under the First Amendment to require that a person hold a business license to conduct the activities in which Santopietro was engaged at the time of her arrest. If not, then it was not objectively reasonable for the Officers to believe Santopietro was violating section 6.56.030, as the ordinance did not validly apply to her actions. *See Mackinney v. Nielsen*, 69 F.3d 1002, 1008 (9th Cir. 1995). We turn now to that question. We review the

district court's grant of summary judgment to the Officers de novo and construe the facts in the light most favorable to Santopietro. *See Fogel v. Collins*, 531 F.3d 824, 829 (9th Cir. 2008).[5] In conducting this inquiry, it is helpful to break the relevant facts into digestible parts. The facts available to the Metro Officers at the time of the arrest fall into three categories: Santopietro's street performance activities; her association with Patrick and Patrick's acts; and, finally, any other actions Santopietro took in the lead-up to the arrest.

## A.  Street Performance

Performances on public sidewalks and in public parks—both "traditional public fora"—are protected under the First Amendment as expressive activity. *See Berger*, 569 F.3d at 1035–36. Although street performances are subject to reasonable time, place, and manner restrictions, *id.* at 1036, we have never upheld a law that subjects individuals or small groups who wish to engage in non- commercial expressive activity in public fora to advance notice and permitting requirements, *see id.* at 1039. "[T]he significant governmental interest justifying the unusual step of requiring citizens to inform the government in advance of expressive activity has always been understood to arise only when large groups of people travel together on streets and sidewalks." *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1039 (9th Cir. 2006); *see also Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1034 (9th Cir. 2009).

---

[5] We later consider whether partial summary judgment should have been entered for Santopietro on her First Amendment claim, as she requested. *See* Part II, *infra*.

The sidewalks along the Las Vegas Strip dedicated to public use are public fora. *See Venetian Casino Resort, L.L.C. v. Local Joint Exec. Bd. of Las Vegas*, 257 F.3d 937, 943 (9th Cir. 2001). As applied here, Clark County Code § 6.56.030 would have required Santopietro to obtain an individual license or be employed by a licensed business before engaging in her activities on the sidewalks of the Las Vegas Strip. But any such requirement would run squarely afoul of *Berger*'s central holding, that a permitting scheme that "requires single individuals to inform the government of their intent to engage in expressive activity in a public forum, a requirement that neither we nor the Supreme Court has *ever* countenanced," is not permissible. 569 F.3d at 1048. The Clark County ordinance is thus indubitably invalid as applied to Santopietro's performance as a "sexy cop." Because of their training regarding the MOU, the Officers understood that.

Additionally, the solicitation of tips is "entitled to the same constitutional protections as traditional speech." *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 792 (9th Cir. 2006). Municipalities accordingly may not ban either "passive" solicitation of tips for street performance (e.g., putting a hat out or saying "thank you"), or "active" solicitation (e.g., encouraging a tip orally or by tipping a hat). *See Berger*, 569 F.3d at 1052. If only "active" solicitation is banned, "an officer seeking to enforce [that] ban 'must necessarily examine the content of the message that is conveyed.'" *Id.* (quoting *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992)). As a content-based regulation of speech in a public forum, such a ban is subject to strict scrutiny, a standard not met by a distinction between active and passive solicitation of voluntary tips. *Id.* at 1052–53. Metro's 2010 MOU

appears to incorporate that holding, by recognizing that "non-coercive solicitation of tips[] is not a *per se* violation" of the County Code's business licensing provisions.

If Santopietro's activities remained within the scope of protected street performance and protected solicitation of tips, then the Officers could not properly arrest her. So the central dispute is whether Santopietro's actions went beyond protected expression and moved into the realm of business activity subject to Chapter 6 regulations. More specifically, the Officers recognize that both Santopietro's costumed performance and her reply to Howell's inquiry about the cost of a photo—"It doesn't cost anything. We just ask for a tip."—were within the First Amendment's protections and so were not regulable commercial activity, as both *Berger* and the MOU established. But, the Officers contend, those actions provide a basis to associate Santopietro with Patrick and Patrick's statements, which they maintain *did* go beyond the realm of speech protected under *Berger* and *were* regulable under Chapter 6 of the Clark County Code. We turn, therefore, to whether Santopietro could be arrested, consistently with the First Amendment, not for anything she said or did but because of her association with Patrick.

## B. Expressive Association

Because we are examining the grant of summary judgment to the Officers and so construe the facts in the light most favorable to Santopietro, we assume here that Patrick, not Santopietro, asked for the photo to be deleted. We shall also assume for present purposes, without deciding, that Patrick's alleged "verbal agreement" statement, and perhaps her request that Crawford delete the photograph, established

probable cause to believe that Patrick was demanding a fee for service, not a voluntary tip. And we shall finally assume for present purposes, also without deciding, that such a demand, although not coercive in the ordinary sense of that word, would take the quid-pro-quo exchange outside the ambit of the protected First Amendment expression we addressed in *Berger*, such that the exchange itself could potentially be covered by Clark County Code § 6.56.030.

Under those assumptions, if Patrick's actions may be imputed to Santopietro for the purposes of establishing probable cause to arrest, the scope of facts available to justify her arrest widens significantly. We conclude, however, that the First Amendment protections accorded Santopietro's own activities do not lapse because of what Patrick said or did without Santopietro's direct participation. Rather, Santopietro and Patrick's expressive association may not be the sole basis relied upon to attribute Patrick's actions to Santopietro.

Association for the purpose of engaging in protected activity is itself protected by the First Amendment. "[I]mplicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) (collecting cases); *see also NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). This First Amendment right extends only to "expressive association," that is, to associations "engage[d] in expressive activity that could be impaired" by government action. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 655 (2000).

"Government actions that may unconstitutionally burden this [expressive association] freedom may take many

forms." *Id.* at 648. For example, the First Amendment "restricts the ability of the State to impose liability on an individual solely because of his association with another." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 918–19 (1982). It has long been "established that 'guilt by association alone, without [establishing] that an individual's association poses the threat feared by the Government,' is an impermissible basis upon which to deny First Amendment rights." *Healy v. James*, 408 U.S. 169, 186 (1972) (alteration in original) (quoting *United States v. Robel*, 389 U.S. 258, 265 (1967)).

These considerations necessarily factor into whether the First Amendment allows arresting an individual engaged in protected expressive activity in conjunction with another person simply because the second person's behavior crossed the line into actions that may be subject to a valid regulation of commercial activity. Even outside the context of protected First Amendment expressive association, "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). *Claiborne Hardware* and *Healy* make lucidly clear that the "more" cannot consist of inferences of possible criminal involvement based solely on an individual's First Amendment-protected activities and associations.

In *Claiborne Hardware*, for example, a local NAACP chapter in Claiborne County, Mississippi, voted to boycott white-owned stores in an effort to put pressure on local elected officials to implement racial justice reforms. 458 U.S. at 889. Boycott activities occurred between 1966 and 1972. *Id.* at 893. Local NAACP leaders encouraged stronger enforcement of the boycott in the wake of a few significant events, including the assassination of Dr. Martin Luther

King, Jr., in 1968, and a police shooting of a local black man in his home in 1969. *Id.* at 901–02, 902 n.31. Some of the leaders' words of encouragement included threatening language. *Id.* at 902. Additionally, a handful of enforcement actions taken by individual participants in the first year of the boycott had involved violent acts, such as throwing a brick through the window of a car owned by a boycott violator. *Id.* at 903–06. In an action brought by white business owners against the NAACP, its local leaders, and more than 100 boycott participants, the Mississippi state courts rejected the defendants' arguments that their conduct was protected by the First Amendment. *Id.* at 890–91, 895.

The Supreme Court held that First Amendment protections are not lost "merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected." *Id.* at 908. Rather, "the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to . . . liability *and* on the persons who may be held accountable." *Id.* at 916–17 (emphasis added). More specifically, "[f]or liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Id.* at 920.

Here, the record indicates the Officers had no evidence before them when they decided to arrest Santopietro that suggested that the "sexy cops" *association* had any purpose that could have fallen outside the protection of the First Amendment under *Berger*. Nor was there evidence of Santopietro's intent to engage with Patrick in anything other than clearly constitutionally protected expressive activity (which, again, includes active solicitation of voluntary tips). Both "sexy cop" performers were engaging largely, if not

entirely, in activity that was not only legitimate but also constitutionally protected. The only evidence offered by the Officers on appeal to demonstrate the two women were "working together" is that they "wore the same costumes, portrayed the same 'sexy cop' characters, and posed for pictures together"—i.e., evidence of expressive association to engage in street performance. There is no evidence at all, for example, of a prior agreement between the women to require a quid-pro-quo payment for posing in photos, nor of a demonstrated pattern of demanding quid- pro-quo payments during performances together. Thus, on the summary judgment record viewed most favorably to Santopietro, Santopietro associated with Patrick only for expressive activity protected under *Berger*.

Even if Patrick's follow-ups to Howell's initial statements that he would tip or to his later statements that he would not transformed *her* actions into regulable commercial activity—again, we do not decide that question—they did not transform the street performance *association* into an unprotected one, any more than the violent action by some participants in the NAACP-led boycott in *Claiborne Hardware* transformed the entire boycott effort into unprotected activity.

Indeed, were no First Amendment protections at issue, we still very much doubt that a "common enterprise" between Santopietro and Patrick could reasonably be inferred for the purposes of establishing criminal liability. "Individualized suspicion" can, under certain circumstances, be based on an inference of a "common enterprise," *see Maryland v. Pringle*, 540 U.S. 366, 372–73 (2003), but reliance on such an inference would not be reasonable under the facts here.

In *Pringle*, police pulled a car over for speeding at 3:16 a.m. and seized $763 from the glove compartment and five plastic baggies containing cocaine from the back seat after the driver consented to a search of the vehicle. *Id.* at 367–68. In addition to the driver, Pringle and one other passenger were in the car at the time of the stop. *Id.* When questioned about the drugs and the money, none of the men offered any information. *Id.* at 372. The inference of a common enterprise was held reasonable in *Pringle*, because "[t]he quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him." *Id.* at 373. *Pringle* made clear, however, that "[a]ny inference that everyone on the scene of a crime is a party to it must disappear if the Government . . . singles out the guilty person." *Id.* at 374 (alteration in original) (quoting *United States v. Di Re*, 332 U.S. 581, 594 (1948)).[6]

The facts offered to justify the arrests of all three men in the car in Pringle are not present here. At the time of the

---

[6] Similarly, in ruling that the district court did not misstate the law by instructing the jury that, under certain circumstances, the Fourth Amendment's reasonableness requirement could be satisfied without individualized suspicion, we held in *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1194 (9th Cir. 2015), that "[i]f a group or crowd of people is behaving as a unit and it is not possible (as it was in *Ybarra*) for the police to tell who is armed and dangerous or engaging in criminal acts and who is not, the police can have reasonable suspicion as to the members of the group," *id.* at 1195. Here, no one was armed and dangerous, the street performers were not part of a crowd, and the police, who were directly dealing with the two individuals involved, directly observed thebehavior of each one.

arrests in this case, the Officers were able to single out who had made the statements they offer as the basis for the arrest.

Additionally, unlike inferences that could be drawn from traveling in a vehicle with contraband and evidence of drug dealing, it is unreasonable to assume from the violation at issue here—doing business without a license—that Santopietro would have known about and subscribed to any activity Patrick may have planned or spontaneously decided to undertake.[7]

In sum, to infer from Santopietro and Patrick's shared costumes and joint performance, alone, an agreement to

---

[7] We have held that an association may establish more than "mere propinquity" if there are "some additional circumstances from which it is reasonable to infer participation in criminal enterprise." *United States v. Hillison*, 733 F.2d 692, 697 (9th Cir. 1984). In making such determinations, important considerations include, (1) whether the association is with someone who is known to be engaging in criminal activity and coincides with that criminal activity, and (2) "whether the nature of the criminal activity is such that it could not normally be carried on without the knowledge of all persons present." *Id.*

The considerations relied upon in *Hillison* do not justify an arrest here. The Officers do not maintain that, prior to initiating interaction with the women, they had formed any individualized suspicion that either "sexy cop," whether alone or in association with the other, was engaged in unlawful activity. Rather, the only facts the Officers presented to support Santopietro's arrest were obtained during the Officers' interactions with the women immediately preceding their arrests.

Also, upon approaching the women, the Officers first witnessed the "sexy cops" engage only in First Amendment protected street performance, which included their solicitations of tips. Nothing about the ensuing events suggested any prior agreement or understanding between the women to associate for anything beyond the carrying out of those protected activities.

engage in a regulable transaction impermissibly burdens the right to engage in purely expressive activity and association. We hold that something more than that constitutionally protected activity is required to justify Santopietro's arrest.

### C.  Santopietro's Other Actions

We therefore consider whether there were any actions Santopietro took on her own that fall outside the First Amendment's protection under *Berger*. Viewing Santopietro's activities separately from Patrick's, we conclude that summary judgment for the Officers was improper as, on the facts most favorable to Santopietro, her actions were entirely protected expression.

The heart of the parties' disagreement is whether Santopietro engaged only in street performance or *also* in regulable commercial activity. The evidence presents conflicting accounts regarding (1) which statements Santopietro made, and (2) the nature and tone of the statements she made. Santopietro made at least two statements to the officers before her arrest.

First, when approached by Howell and asked about the cost of a photo, Santopietro said, "It doesn't cost anything. We just ask for a tip. We pose for tip[s]." Second, when asked by Crawford what she would do to the camera if Crawford did not delete the photo, Santopietro said, "I'm not going to do anything to your camera. I'm not going to touch you. What exactly are you trying to get me to say?" These statements on their own are, at most, active solicitation of tips by a street performer and so, for the reasons already surveyed, an impermissible basis under *Berger* for arrest.

A third statement is in dispute. Crawford stated in her deposition that Santopietro indicated she "wanted" the

officers to delete the photo if they were unhappy with it, telling Crawford she "*had* to delete the picture if [the Officers] didn't give [the performers] a tip." (Emphasis added). But Howell stated in his deposition and arrest report that Patrick, not Santopietro, made that demand.

Lopez-Rosende deferred to Howell's version of those facts. Santopietro also contends that she never made any such statement. Further, she asserts that Patrick made no demand directly linking the picture to a monetary payment, but only quietly queried, "if you're unhappy, would you mind deleting it, then, the picture."

Construing the facts in the light most favorable to Santopietro, Patrick, not Santopietro, made the comment to Crawford regarding the deletion of the photo. Santopietro's undisputed statements and actions do not even arguably evidence a business transaction. We need not reach the second factual dispute, regarding the precise import and tone of the statement, to conclude that the district court erred in granting summary judgment to the Officers.[8]

---

[8] Alternatively, the Officers contended below and, briefly, on appeal that they are entitled to qualified immunity. We determine whether qualified immunity should be granted by construing the facts in the light most favorable to the non- moving party. *See Jeffers v. Gomez*, 267 F.3d 895, 903 (9th Cir. 2001) (per curiam). As we have explained, viewing the facts in the light most favorable to Santopietro, it is plain under *Berger*, 569 F.3d 1029, and the Court's longstanding freedom of association precedent, that her activities on the record as so construed were fully protected under the First Amendment. No reasonable officer could have inferred otherwise. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011).

## II.  Santopietro's Motion for Summary Judgment

Because Santopietro has appealed the district court's denial of her motion for partial summary judgment as well as the final order granting summary judgment to the Officers, we consider that denial separately. *See Jones-Hamilton Co. v. Beazer Materials & Servs., Inc.*, 973 F.2d 688, 693–94 (9th Cir. 1992). Viewing the facts this time most favorably to the Officers, we conclude that denial of summary judgment to Santopietro was proper, although Santopietro may well prevail after trial.

Again, genuine disputes of fact remain as to (1) which statements Santopietro made, and (2) the nature of the statements made. Resolving the first question in the light most favorable to the Officers, it was Santopietro, not Patrick, who either asked Crawford to delete the photograph if Howell did not like it, or demanded that she do so if the Officers refused to provide a tip. As to the nature of that statement, on the evidence before us, a reasonable jury could conclude that Santopietro instigated a quid-pro-quo transaction by demanding that Crawford disgorge the photograph if the officers refused to fulfill their end of the bargain. If Santopietro's words or actions demonstrated that she was selling her performance, the sale would still likely warrant First Amendment protection. *See Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1063 (9th Cir. 2010) ("[E]ven 'an artist's *sale* of his original artwork constitutes speech protected under the First Amendment.'" (quoting *White v. City of Sparks*, 500 F.3d 953, 954 (9th Cir. 2007)). But, as *Anderson* went on to hold, the "business" of selling protected expression can be "subject to reasonable time, place, or manner restrictions." *Id.* Determining whether Clark County Code § 6.56.030 as applied to a quid-pro-quo exchange of a photograph is a reasonable "time, place, or

manner" restriction "requires an inquiry into whether the restriction: (1) is justified without reference to the content of the regulated speech; (2) is narrowly tailored to serve a significant governmental interest; and (3) leaves open ample alternative channels for communication of the information." *Id.* at 1064 (internal quotation marks and alteration omitted). Because the parties have not addressed whether the peddling licensing ordinance as applied to sales by, rather than voluntary tips to, a street artist is a valid time, place, or manner restriction, we leave the resolution of that question, if it proves necessary, to the district court on remand.

Given that genuine disputes of material fact persist in the record, the district court should not have granted summary judgment to either party. *See Simo v. Union of Needletrades*, 322 F.3d 602, 610 (9th Cir. 2003). On remand to the district court to review the validity of Santopietro's arrest under the appropriate First Amendment constraints, the district court—by a jury trial, of course, if properly requested— should first resolve the factual dispute concerning whether Santopietro made the statement regarding deletion of the photo. If she did, the trier of fact should additionally resolve the factual disputes as to the nature of her statement and then determine whether Santopietro's actions demonstrate a quid-pro-quo offer for services properly subject to analysis as a sale of her performance. If so, the district court should decide whether the licensing requirement under Clark County Code § 6.56.030 is a valid time, place, or manner restriction as applied to the facts as determined.

## CONCLUSION

The district court erred by deciding that the Officers had probable cause to arrest Santopietro despite the First Amendment protections afforded to her expressive

association with Patrick. We therefore reverse the grant of summary judgment to the Officers. As to the denial of partial summary judgment to Santopietro, we remand for a determination after trial of the disputed factual issues and for consideration in light of this opinion as to whether, on the facts thus determined, Santopietro was validly arrested for her own statements and actions.

**REVERSED, IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.**